169 N.J. Super. 425 (1979)
404 A.2d 1256
M.P., PLAINTIFF-RESPONDENT,
v.
S.P., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 30, 1979.
Decided July 23, 1979.
*426 Before Judges HALPERN, ARD and ANTELL.
Ms. Phyllis G. Warren argued the cause for appellant.
Mr. Alan Domers argued the cause for respondent (Messrs. Farr, Reifsteck & Wolf, attorneys).
Mr. Richard D. Barker argued the cause for amicus curiae, American Civil Liberties Union of New Jersey.
The opinion of the court was delivered by ANTELL, J.A.D.
Defendant (former wife) was awarded a divorce for sexual cruelty by judgment dated September 11, 1969 after a six-year marriage from which two children were born, Franceen, (fictitious name) on June 8, 1964 and Joy (fictitious name) on July 15, 1968. She received custody of the daughters, and until the determination before us for review they have always resided with their mother, a period of about seven years after the divorce.
On May 20, 1975 the Chancery Division ordered defendant to show cause why custody of the children should not be transferred to plaintiff on the ground that defendant "is an unfit mother." The order was signed on plaintiff's application, his first since the judgment of divorce. After a number of hearings, the last of which was on January 22, 1976, the trial judge, by letter opinion dated August 30, 1976, awarded custody to the father, directing that the "provision for custody shall take effect immediately and shall be explained at length in my opinion to follow as soon as possible." The *427 judge's oral opinion was delivered September 23, 1977 and his order, transferring custody and granting defendant rights of visitation, was filed on October 3, 1977. We have not been told of any valid reason for the lengthy delays in the foregoing sequence of procedural events. Our concern is that this unexplained delay on the trial judge's part should not be the basis for denying defendant relief if she is otherwise entitled thereto. Defendant appeals on the ground that the trial judge erred in modifying the judgment and divesting her of custody.
Central to this appeal is the fact that defendant is an admitted practicing homosexual. She argues that the action below was taken because of this fact alone and is therefore not legally sustainable. Plaintiff expressly disavows any claim that defendant is an unfit mother by reason of her homosexuality. He concedes that her right to custody of the children cannot be denied, limited or restricted on the basis of her sexual orientation alone  a proposition with which we are in accord. In re J.S. & C., 129 N.J. Super. 486, 489 (Ch. Div. 1974), aff'd 142 N.J. Super. 499 (App. Div. 1976).[1] Furthermore, compatibly with the uncontradicted *428 expert testimony, plaintiff disclaims being concerned with "any threat that the childrens' sexual development will be in any way altered by the fact that defendant is a homosexual." Rather, he relies for affirmance exclusively upon a claim of changed circumstances since the date of the original custody award such that the best interests of the children dictate modification of that determination.
At the outset it is noted that the trial judge made no finding, nor in any way concerned himself with the issue, of changed circumstances.
The evidence discloses that from the beginning this marriage was afflicted by sexual discord. Although the record is burdened with detailed testimony in which each party blames the other for their disastrous relationship, much is irrelevant except to demonstrate that at least from the time of their separation in 1967 plaintiff has been aware of defendant's homosexual propensities. As he knew when they separated, defendant was involved in an affair with another woman (Barbara), one which continued through and beyond the date of the divorce.
After the divorce defendant moved into a small apartment and plaintiff exercised weekly visitation rights with respect to the older daughter, Franceen, but refused to acknowledge Joy as his child. He persisted in this refusal, failing even to visit her when she was hospitalized, until adjudicated the father and ordered to pay for her support. It was as a result of defendant's persuasion that he eventually included Joy in his visits.
On October 14, 1970 defendant voluntarily admitted herself to Ancora State Hospital to be treated for a depressive neurosis. Plaintiff made no attempt to obtain custody at *429 that time, and the daughters were cared for by defendant's parents. After defendant left the hospital on December 17, 1970 she and the girls lived with her parents until the summer of 1974. During this time defendant worked full-time and attended counseling sessions.
In the fall of 1974 Joy developed emotional problems that impaired her learning abilities[2] and defendant reduced her work to a part-time basis. She observed Joy's work in school, met frequently with her teachers, met with the school psychologist and helped with remediating Joy's motor coordination skills. The child was also enrolled in a county guidance center where mother and daughter attended sessions together, and Joy was thereafter returned to regular classes.
The evidence shows that defendant has been equally concerned with the needs of Franceen.
In late 1974, upon the advice of school officials, defendant and the girls left the household where they had been residing. For three months thereafter they resided with "Joyce," defendant's lesbian companion. This arrangement was unworkable, however, since Joyce lived in a school district different from where defendant's daughters were enrolled. Therefore, in the interests of her children defendant returned to her parents' home. During the foregoing period defendant and Joyce slept apart and the children had their own room.
No specific findings were made in connection therewith, but the record is uncontradicted that defendant is an attentive mother who fed and dressed her children well, provided them with medical and dental care, and arranged for surgery, allergy tests and orthodonture. She has done all that can be expected of a dutiful mother.
Although he determined to alter the custody arrangement, the trial judge found that defendant was "a very warm, loving mother," that she "cares for her children and generally *430 within her means, at least at a level deemed minimally adequate, has provided for them." Recognizing, however, that plaintiff was "equally concerned" with the children, the judge decided to "examine into the question of homosexuality as a disqualifying effect on a parent."
The trial judge apparently weighed against defendant the fact that she was caught up "in an attempt to find her own identity and to deal with the problems" arising from her sexual status. However, he did not explain what problems he had in mind or in what way her problems or her quest for identity were different from those of most ordinary people; more importantly, he made no attempt to articulate a relationship between any of this and the welfare of the children. The judge also noted that defendant's ongoing liaison with her lesbian companion had "materially upset the older child and will have a slight influence in all probability, from the credible evidence, on the younger child." On an earlier occasion the judge had ordered that defendant not share Joyce's company at any time when the children were present, and this order has not been violated. Furthermore, there is nothing in the record to show any nexus between defendant's sexual companionship and the older girl's reaction.
Nowhere do we find documented in the record any specific instances of sexual misconduct by defendant or evidence that she tried in any way to inculcate the girls with her sexual attitudes. To the contrary, the evidence is affirmatively to the effect that she never displayed any sexual behavior in the presence of her children, and that she refrains from any demonstration of affection toward other women when the girls are present. Moreover, she is not a member of any homosexual organization. As we said in De Vita v. De Vita, 145 N.J. Super. 120 (App. Div. 1976):
When dealing with custody the burden of proof required to show that a mother is guilty of gross sexual misconduct to the detriment of her children is a heavy one. [at 124]
*431 It is well settled that the best interests of the child are of primary concern to the court in any matter involving the custody of minor children. Fantony v. Fantony, 21 N.J. 525, 536 (1956). Since the conditions which would satisfy the best interests of a child during all of its minority cannot be conclusively determined in a single decree, custody orders are always held to be modifiable upon a showing of changed circumstances that would affect the welfare of the child. Borys v. Borys, 76 N.J. 103, 111 (1978); Mimkon v. Ford, 66 N.J. 426, 438 (1975). The party seeking the modification bears the burden of showing sufficient changed circumstances so as to require modification. Sheehan v. Sheehan, 51 N.J. Super. 276, 287 (App. Div.), certif. den. 28 N.J. 147 (1958); 24 Am. Jur.2d, Divorce and Separation, § 819 (1966); 27B C.J.S. Divorce § 317(2)(b) (1959).
In assessing a claim of changed circumstances deference is given to the length and stability of the existing custody relationship. S.M. v. S.J., 143 N.J. Super. 379, 385 (Ch. Div. 1976). The potential for damage which resides in removing a child from its psychological parent has been recognized in a number of cases. In In re P, and wife, 114 N.J. Super. 584, 592-93, 595 (App. Div. 1971), we held that although neither set of parents was obviously better fit than the other, the best interests of the child mandated that custody remain with the psychological foster parents, rather than the biological parents. Also see Hoy v. Willis, 165 N.J. Super. 265, 277 (App. Div. 1978); Kattermann v. DiPiazza, 151 N.J. Super. 209, 213-214 (App. Div. 1977); In re Adoption of Child by R.D., 127 N.J. Super. 311, 315-16 (App. Div.), certif. den. 65 N.J. 292 (1974); Goldstein, Freud and Solnit, Beyond the Best Interests of the Child (1973). So important is this factor that our Supreme Court pointedly stated in Sorentino v. Family & Children's Soc. of Elizabeth, 72 N.J. 127 (1976), that one seeking to change the child's custodial status quo
* * * will have the burden of proving by a preponderance of the credible evidence that the potentiality for serious psychological harm *432 accompanying or resulting from such a move will not become a reality. [at 133]
Not only did plaintiff offer no proof to meet this formidable burden, but, as we noted earlier, the trial judge made no findings which pointed to a change of circumstances. The only conclusion to be drawn is, as defendant claims, that the custody order was modified for the sole reason that she is a homosexual and without regard to the welfare of the children. This conclusion gains added support from our further analysis of the record and the determinations before us for review.
In awarding custody to plaintiff the trial judge did so on the reasoning that plaintiff
* * * may provide a more stable atmosphere for the custody, maintenance and welfare of these children. His home is more stable. He is financially secure and is able to provide the children with the best type of care, custody, maintenance and it is in their best interests that the Court feels that custody should reside in the father.
However, absent from the record is any factual basis for the judge's belief that the father's home is more stable than defendant's or that he is "financially secure and is able to provide the children with the best type of care, custody, maintenance * * *." Actually, at the time of the hearing plaintiff was in arrears on his child support obligations in the amount of almost $5,000, a fact which has caused defendant to apply for welfare assistance. When asked by the trial judge why he had not been making the payments, he explained only, "I imagine it is a combination of things," and stated that support would be "easier having the children with you."[3] As to his sincerity of purpose in seeking custody, we note again that plaintiff initially denied that he was Joy's father, *433 and in the course of the judicial proceedings which followed he admittedly testified falsely in denying that he had had sexual relations with defendant during certain critical times. The inference is at least reasonable that if defendant had not brought proceedings in aid of execution to compel plaintiff to meet his support obligations, plaintiff's custody application would not have been made.
Nor are we shown any factual support for the trial judge's evident belief that the children are being harmed or are likely to be harmed by continued custody with defendant. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-84 (1974). The only findings offered for this purpose are that defendant's homosexuality has "affected" Franceen; that it has "materially upset" her, and that it "will have a slight influence in all probability" on Joy. Against this the report of Dr. Yaskin, the psychiatrist appointed by the court at the recommendation of plaintiff's attorney, concludes that the younger child, Joy,
* * * is seriously in need of her mother's continuing emotional support. Her on-going deep identification and dependency is with the mother and it is my clinical opinion that any attempt, at this time, to separate [Joy] from her mother will result in serious psychological consequences to the child.
Reporting on Franceen he comments that she is "rather well poised" and "that she has no ongoing emotional or behavioral problems." Further,
[T]here is no question that she loves her mother. She states, without hesitation, that her mother has always shown an adequate concern re the nutrition and their dress. She also states her mother has always been kind to her and has never abused her. She adds, "I know she loves me." I asked her if there was anything in her ongoing relationship with her mother that she objected to and she answers, "No  mother is a good person."
Dr. Yaskin took account of Franceen's expressed desire to live with her father, but concluded that her reasons were "puerile," i.e., that she could "go fishing and everything" *434 with her cousins who lived nearby; that she feels sorry for her father sometimes, and that she has feelings of affection for her baby step-brother. The doctor found that Franceen had no "real ongoing concern or realistic knowledge as to what the term homosexuality connotes" and "just considers it as a type of relationship." His report left no doubt that she "has a deep maternal attachment and identification."
In dismissing this testimony the trial judge said nothing more than that he would "totally reject" the expert evidence which fully supported continued custody in defendant mother because he did "not find it credible in its postulates and conclusions." In doing so he overlooked the fact that the assistance of experts as an aid in resolving the difficult questions presented was clearly desirable. We emphasize that it was the trial judge himself who, evidently recognizing his own lack of expertise, requested the examination and report from Dr. Yaskin, whose name was recommended to him by the plaintiff's own attorney. As we have noted elsewhere, the testimony of child study specialists is properly relied on by the courts. In re P, and wife, supra 114 N.J. Super. at 593. These witnesses were qualified, their opinions were unrefuted and were not inherently implausible. As in Hoy v. Willis, supra, we see no reason why they should have been ignored in this case. See, too, Sorentino v. Family & Children's Soc. of Elizabeth, 74 N.J. 313, 320 (1977).
Apparently the trial judge placed greater credence in what the children told him during in camera hearings, some of which was recorded, some not. For example, he concluded that Franceen disliked defendant's companion, Joyce, "almost to the point of hatred," but there is nothing in Franceen's recorded testimony to support such a belief.[4] If it was based on something he was privately told by the child, it was *435 not memorialized in the manner suggested in State v. Green, 129 N.J. Super. 157, 166 (App. Div. 1974). Except for the conclusion which he drew therefrom, there is nothing to show what he was told off the record, and without some disclosure to the parties on the record it should not have been allowed to influence his decision. In effect, defendant was denied an opportunity to be heard on the facts. Callen v. Gill, 7 N.J. 312, 319 (1951).
In modifying custody the trial judge rejected the "tender years" doctrine as "an obsolete, untenable, antediluvian theory." We disagree that he was free to disregard in this manner the ages of the children as a factor in determining where custody should lie. Although our personal views may be contrary, the Supreme Court has still not displaced the doctrine that custody of a young child "is normally placed with the mother, if fit." Esposito v. Esposito, 41 N.J. 143, 154 (1963). Also see Mayer v. Mayer, 150 N.J. Super. 556, 563-64 (Ch. Div. 1977). That the children were still of tender years was something which should have been weighed in this case in favor of preserving the custodial arrangement, and the trial judge erred in failing to do so.
We have already noted that the trial judge made no finding of changed circumstances as a reason for modifying the custody provision. However, plaintiff argues that a change of circumstance may nevertheless be found in the fact that defendant's variant sexual orientation now causes embarrassment to the girls in the eyes of their peers. We address ourselves to this final contention.
It is first observed that the trial judge made no finding of fact which lends support to plaintiff's claim. All he said was that Franceen had been "upset" by Joyce, defendant's lesbian friend, a problem earlier resolved by banishing Joyce from the presence of the children. The only evidence of "embarrassment" is to be found in Franceen's testimony about conversations with her friends, in which she was asked why her mother dated other women. Nothing therein suggests that *436 these were in any way traumatizing. We know of no finding by the trial judge that Franceen is "pressured by her peers," nor how such a finding could be supported by the proofs. In fact, we do not understand the sense in which this expression is used in the dissenting opinion or the weight which such a finding could be accorded within the context of this case.
Plaintiff's argument overlooks, too, the fact that the children's exposure to embarrassment is not dependent upon the identity of the parent with whom they happen to reside. Their discomfiture, if any, comes about not because of living with defendant, but because she is their mother, because she is a lesbian, and because the community will not accept her. Neither the prejudices of the small community in which they live nor the curiosity of their peers about defendant's sexual nature will be abated by a change of custody. Hard facts must be faced. These are matters which courts cannot control, and there is little to gain by creating an artificial world where the children may dream that life is different than it is.
Furthermore, the law governing grants of custody does not yield to such narrow considerations. Of overriding importance is that within the context of a loving and supportive relationship there is no reason to think that the girls will be unable to manage whatever anxieties may flow from the community's disapproval of their mother. In Commonwealth ex rel. Lucas v. Kreischer, 450 Pa. 352, 299 A.2d 243 (Sup. Ct. 1973), the trial court awarded custody of the children, whose mother had entered into an interracial marriage, to their father because of the "almost universal prejudice and intolerance of interracial marriage." In reversing, the Supreme Court of Pennsylvania rested its determination upon the following observation, which we deem pertinent, made by the dissenting judge of the intermediate appellate court:
"[I]n a multiracial society such as ours racial prejudice and tension are inevitable. If * * * children are raised in a happy and *437 stable home, they will be able to cope with prejudice and hopefully learn that people are unique individuals who should be judged as such." [299 A.2d at 246].
Mistaken also, in our view, is plaintiff's assumption that the welfare of the children cannot be served unless they are sheltered from all the adversities that are inherent to their basic life situation. Regrettably, the decision as to where custody shall lie must be made in terms of available alternatives, and in this case neither holds out the promise of a completely unguent environment. While one is troubled by the possible problems that may arise from defendant's homosexual bent, the evidence also strongly features a disturbed and abrasive personal relationship between Joy and plaintiff's present wife which has resulted in the administration of unduly harsh discipline to this child. She also dislikes and fears plaintiff.
Conceding that Franceen prefers to live with her father and his present wife, reservations as to the advisability of such a course are at least suggested by testimony describing talks between the wife and Franceen. In these the 11-year-old was told, with explanatory detail, how great a "stud" her father is. Also germane to the flavor of this "stable atmosphere" are certain nude pictures of the present wife, who posed in the family home for four "photographers," including one who also serves as the family dentist. Although the wife denied that to the "best of my knowledge" these were ever viewed by the children, they had been left under the pillows of a couch in the living room. And, if it is "the thinking of the vast majority of society" that concerns us, it should be noted that before marrying plaintiff the wife underwent an illegal abortion of an out-of-wedlock child fathered by another man.
Nor may we disregard the appalling character of the sexual onslaughts carried out during their marriage by plaintiff upon defendant for which the divorce was granted. Without detailing his singular conduct or the variety of foreign objects *438 he introduced into her person, we acknowledge our willingness to understand how these could well have stifled forever her initial efforts to enjoy heterosexual love in a conventional relationship.
Although plaintiff's sexual behavior cannot, perhaps, be categorized in terms which are as emotionally charged as "homosexual" or "lesbian," it is so far out of the ordinary as to create the most acute anxieties about entrusting so troubled and deviant a personality with the responsibility of creating an environment for the upbringing of two young girls. Even if the rule of changed circumstances were not applicable and we were free to weigh anew the relative advantages of these two arrangements, taken with the considerations previously noted, plaintiff's conduct illuminates the completely speculative nature of any determination that because she is a lesbian, custody with defendant will be more destructive of the children's welfare than with plaintiff.
If defendant retains custody, it may be that because the community is intolerant of her differences these girls may sometimes have to bear themselves with greater than ordinary fortitude. But this does not necessarily portend that their moral welfare or safety will be jeopardized. It is just as reasonable to expect that they will emerge better equipped to search out their own standards of right and wrong, better able to perceive that the majority is not always correct in its moral judgments, and better able to understand the importance of conforming their beliefs to the requirements of reason and tested knowledge, not the constraints of currently popular sentiment or prejudice.
Taking the children from defendant can be done only at the cost of sacrificing those very qualities they will find most sustaining in meeting the challenges inevitably ahead. Instead of forbearance and feelings of protectiveness, it will foster in them a sense of shame for their mother. Instead of courage and the precept that people of integrity do not shrink from bigots, it counsels the easy option of shirking difficult problems and following the course of expedience. *439 Lastly, it diminishes their regard for the rule of human behavior, everywhere accepted, that we do not forsake those to whom we are indebted for love and nurture merely because they are held in low esteem by others.
We conclude that the children's best interests will be disserved by undermining in this way their growth as mature and principled adults. Extensive evidence in the record upon which we have not commented amply confirms the trial judge's finding that defendant is a worthy mother. Nothing suggests that her homosexual preference in itself presents any threat of harm to her daughters or that in the ordinary course of their development they will be unable to deal with whatever vexation may be caused to their spirits by the community.
Careful attention has been given to the nature of the relief to be awarded. Although advantages are evident in remaining for further hearings by which the current status of the matter may be ascertained, after a thorough examination of the entire record we are satisfied that the welfare of the children will only be impaired without corresponding benefit by prolonging any further these already protracted proceedings. The order under review is therefore reversed and the custody provision contained in the judgment of divorce dated September 11, 1969 is reinstated.[5]
*440 HALPERN, P.J.A.D. (concurring).
I concur fully with the views expressed in Judge Antell's opinion because I am convinced that the primary, if not the sole, reason for the trial judge's decision to grant custody to respondent was appellant's admission of being a lesbian. The Federal and State Constitutions are blind to the generic differences between homosexuals and heterosexuals when their legal and constitutional rights are at issue. Judges Antell and Ard agree, as I do, that our only concern here is to do what we fallible mortals believe to be for "the best interests of the children" when the critical issue is presented for determination.
However, for the guidance of trial judges and members of the bar, I am impelled to express my views on the procedure followed in connection with the in camera hearings conducted by the trial judge of the two children, which were only partially taken stenographically. When the difficult and delicate issue of custody of children is involved between antagonistic *441 parents, the trial judge in his sound discretion may consider the wishes of the children involved. N.J.S.A. 9:2-4 provides in relevant part:
* * * If a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody, the court shall consider and give due weight to his wishes in making an award of custody or modification thereof. * * *
The statute does not specify how or where the trial judge may ascertain the children's wishes, or whether his interview with them should be taken stenographically or otherwise recorded. Therefore, we must look to the Rules Governing the Courts of New Jersey for guidance. R. 1:2-2 provides:

1:2-2. Trial Courts: Verbatim Record of Proceedings
In the trial divisions of the Superior Court and in the county courts, all proceedings in court shall be recorded verbatim except, unless the court otherwise orders, pretrial and settlement conferences, calendar calls, and ex parte motions. In the juvenile and domestic relations courts, the county district courts, and the municipal courts, the taking of a verbatim record of the proceedings shall be governed by R. 5:10-6, 6:12-1 and 7:4-5 respectively.
R. 2:5-3(b) provides:
(b) Contents of Transcript; Omissions. Except if abbreviated pursuant to R. 2:5-3(c), the transcript shall include the entire proceedings in the court or agency from which the appeal is taken, including the reasons given by the trial judge in determining a motion for a new trial, unless a written statement of such reasons was filed by the judge. The transcript shall not, however, include opening and closing statements to the jury or voir dire examinations or legal arguments by counsel unless a question with respect thereto is raised on appeal, in which case the appellant shall specifically order the same in the request for transcript.
Considering the statute aforesaid, in conjunction with the cited rules of court, I am of the firm conviction that in custody cases, if a trial judge decides to interview the children in camera, the entire proceedings should be taken stenographically *442 and made available for appellate review. I interpret the mandate in R. 1:2-2 that "all proceedings in court shall be recorded verbatim" to include in camera hearings and should not be limited to proceedings in open court. Any different construction would effectively frustrate a meaningful appellate review. See Callen v. Gill, 7 N.J. 312, 319-320 (1951); Lavene v. Lavene, 148 N.J. Super. 267, 272, n. 1 (App. Div. 1977), certif. den. 75 N.J. 28 (1977); Commonweath of Pennsylvania v. Rider, 248 Pa. Super. 383, 375 A.2d 149 (Super. Ct. 1977); Sweeney v. Sweeney, 241 Pa. Super. 235, 361 A.2d 302 (Super. Ct. 1976); Commonweath of Pennsylvania v. Children's Services, 224 Pa. Super. 556, 307 A.2d 411 (Super. Ct. 1973); Haugen v. Haugen, 82 Wis.2d 411, 262 N.W.2d 769 (Sup. Ct. 1978). Some states by statute require in camera interviews of children in custody cases to be taken stenographically. See Schiele v. Sager, 571 P.2d 1142 (Mont. Sup. Ct. 1977); DeYoung v. DeYoung, 62 Ill. App.3d 837, 19 Ill. Dec. 732, 379 N.E.2d 396 (App. Ct. 1978); In re Stanley F., 86 Cal. App.3d 568, 152 Cal. Rptr. 5 (Ct. App. 1978); Ehrlich v. Ressner, 55 A.D.2d 953, 391 N.Y.S.2d 152 (App. Div. 1977). New Jersey has seen fit to do so by rule of court.
Nor do I believe that a trial judge's summary of the interview comports with the mandate in R. 1:2-2 and R. 2:5-3(b). The judge's subjective reactions to the responses of the children may be incorrect  so, too, the children's answers may not be truthful or accurate  in either event, counsel should have the opportunity of rebutting or explaining the answers. Additionally, a record of the hearing would protect the trial judge from any suspicion of unfairness or false accusations by the children or the losing party. See In re Stanley F., supra 152 Cal. Rptr. at 9. Needless to say, depriving a litigant of the opportunity to explain or rebut, particularly where the children's answers may be the deciding factor in the trial judge's decision, deprives such litigant of due process of law. In addition, as previously indicated, we *443 are severely hampered on the appellate level to meaningfully review the case because of the incomplete record.
Normally, I would remand to the trial judge for a new in camera hearing to be transcribed fully, but I agree with Judge Antell that such would be undesirable in the instant case for the reasons set forth in his opinion.
ARD, J.A.D. (dissenting).
I must respectfully dissent from the opinion of my colleagues. Following the trial in the Chancery Division, Judge Gruccio announced his findings, conclusions and determination in an articulate and detailed opinion. The thrust of this opinion, as it should be, was a determination of what is in the best interests of the children. I am fully persuaded as to the soundness of the conclusions of law, and satisfied that the findings of fact might reasonably have been reached on sufficient, credible evidence in the record, and I would not disturb them. State v. Johnson, 42 N.J. 146, 162 (1964).
This is a custody case. As we stated in DeVita v. DeVita, 145 N.J. Super. 120 (App. Div. 1976):
* * * In our review of an issue of custody the conclusions of a trial judge are entitled to great weight and will not be lightly disturbed on appeal. Sheehan v. Sheehan, 51 N.J. Super. 276, 295 (App. Div. 1951). See also Schwartz v. Schwartz, 68 N.J. Super. 223 (App. Div. 1961). [at 123]
Given this standard of review, I would affirm substantially for the reasons set forth in Judge Gruccio's opinion.
Defendant appears to predicate her appeal on an impassioned defense of the civil liberties of a homosexual mother. However admirable the goal, by so arguing, I earnestly suggest that she has misunderstood the only issue before the trial judge, i.e., the best interests of the children.
Further, our course is charted by a fixed standard of appellate inquiry. It can serve no useful purpose to quote allegations and counter-allegations from a bitterly disputed custody suit, or to isolate certain testimony in an effort to *444 lend support to a given conclusion. Our limited purpose here is to review the holding of the trial judge and determine whether his findings are supported by the record. However, by making their own factual finding, and by drawing "reasonable inferences" therefrom, the majority impermissibly usurps the function of the trial judge who was faced with a balancing of but two choices, custody in favor of plaintiff or custody in favor of defendant. The fact that an appellate court might come to a different conclusion than that of the trial judge does not change our standard of review. The particular deference to be accorded a trial judge's decision as it relates the issue of custody, and the rationale therefore, has recently been stated in Palermo v. Palermo, 164 N.J. Super. 492 (App. Div. 1978). There Judge Horn states:
In considering all the circumstances upon which the child's best interests hinge, a trial court judge has the opportunity to become fully immersed in the details of the case, and his opinion will be given great weight on appeal. The Appellate Division said in In re Flasch, 51 N.J. Super. 1 (1958), certif. den. 28 N.J. 35 (1958):
"The trial judge had the advantage of the personal appearance of the parties and of discussions with the children; additionally he had the wisdom which comes from an accretion of experience in dealing with such matters. Particularly in a case of this nature, is it true that general principles of law do not decide concrete cases, as has been aptly said. Each matter must be decided on its own merits, with the best interests and welfare of the children as the paramount consideration. To this principle, even parental rights must yield. [at 18]" [164 N.J. Super. at 498]
In my opinion, the question before us is not the determination of a homosexual parent's rights, but rather, giving the trial judge's opinion the great weight it deserves, whether this judgment should be disturbed. I believe the trial judge made sufficient findings[1] and his holding is supported by sufficient credible evidence in the record.
*445 In addition, I take issue with several of the premises upon which the majority relies in reversing the trial judge's determination. The majority cites In re J.S. & C., 129 N.J. Super. 486, 489 (Ch. Div. 1974), aff'd 142 N.J. Super. 499 (App. Div. 1976), for the proposition that defendant's "right to custody of the children cannot be denied, limited or restricted on the basis of her sexual orientation alone, * * *." (majority opinion at 427) In fact, that case in no way supports the sweeping principle the majority espouses today.
First, the authority upon which the majority relies is out of context. The full quotation in the In re J.S. & C., supra, case is:
* * * Fundamental rights of parents may not be denied, limited or restricted on the basis of sexual orientation, per se. The right of a parent, including a homosexual parent, to the companionship and care of his or her child, insofar as it is for the best interest of the child is a fundamental right protected by the First, Ninth and Fourteenth Amendments to the United States Constitution. That right may not be restricted without a showing that the parent's activities may tend to impair the emotional or physical health of the child. * * * [129 N.J. Super. at 489; emphasis supplied]
The court is explicit in its recognition that it is, after all, the best interests of the child with which we are concerned, and further, that this claimed "fundamental right" to custody may be denied if it is found that the "parent's activities may tend to impair the emotional or physical health of *446 the child. * * *" In short, the parental "right" to custody of a child does not have the absolute protection the majority gives it. Rather, "[i]t is a principle of long standing that in dealing with the custody and upbringing of an infant the welfare of the child is the controlling consideration. * * * Even parental rights must yield to this principle. * * *" In re Mrs. M., 74 N.J. Super. 178, 183 (App. Div. 1962); N.J. Div. of Youth & Family Serv. v. Huggins, 148 N.J. Super. 86, 92 (Cty. Ct. 1977), aff'd o.b. 160 N.J. Super. 159 (App. Div. 1978). Indeed, it has often been stated that the paramount consideration of the courts is for the "safety, happiness, physical, mental and moral welfare of the child. * * *" Fantony v. Fantony, 21 N.J. 525, 536 (1956), emphasis supplied; In re J.S. & C., supra, 129 N.J. Super. at 493.
This preoccupation with the child's mental and moral welfare, and the consequent limitations these may have on the parent's "fundamental" rights, can be no better illustrated than in the In re J.S. & C. case. There, the mother of the children in question sought to limit the visitation rights of the father, an admitted homosexual. Conversely, the father sought unlimited visitation rights. The central issues, as framed by the trial court, were as follows:
(1) Whether the parental rights of visitation should be restricted on the basis that the father is a homosexual;
(2) Whether the granting of visitation rights to this homosexual father will serve the best interest of the children, and
(3) Whether the visitation rights of this homosexual father should be restricted. [129 N.J. Super. at 489]
In holding that the father's visitation rights could, and must, be limited, the court states that:
* * * [A] parent's right to raise his child as he sees fit is secondary to the State's power to ensure the health and welfare of the child.
Although parents possess various rights such as custody and visitation these rights will fall in the face of evidence that their exercise *447 will result in emotional or physical harm to a child or will be detrimental to the child's welfare. [at 493]
Thus, the authority from which the majority springs in rendering its opinion, in actuality fully supports the course the trial judge below took in placing the children in the custody of their father.
I disagree with the position of the majority which finds fault with the trial judge's total rejection of the expert testimony adduced by defendant. Unquestionably, the credibility of an expert and the weight or value to be accorded his testimony lies within the exclusive domain of the trier of fact. Middlesex Cty. v. Clearwater Village, Inc., 163 N.J. Super. 166, 173-174 (App. Div. 1978); Mohr v. B.F. Goodrich Rubber Co., 147 N.J. Super. 279, 284 (App. Div. 1977), certif. den. 74 N.J. 281 (1977); Savoia v. F.W. Woolworth Co., 88 N.J. Super. 153, 162 (App. Div. 1965); Angel v. Rand Express Lines, Inc., 66 N.J. Super. 77, 85-86 (App. Div. 1961). Further, and more importantly for purposes of this case, the trial judge, as the factfinder, is not bound by this expert opinion. Though it may be helpful in the determination of a point in issue, "just as a jury, a judge may adopt `so much of it as appears sound, reject all of it, or adopt all of it.' * * *." Middlesex Cty. v. Clearwater Village, Inc. supra, 163 N.J. Super. at 174, citation omitted. See also, Huddell v. Levin, 537 F.2d 726, 736, n. 4 (3 Cir.1976). As stated in Minnesota Mining & Mfg. Co. v. Berwick Indus., Inc., 532 F.2d 330, 333 (3 Cir.1976), "* * * it is axiomatic that the trier of fact is not bound to accept expert opinion, even if uncontradicted." (Citations omitted; emphasis supplied). Thus, the fact that the trial judge here rejected defendant's experts' testimony gives no cogent reason for the majority's concern since such action was clearly within the judge's province. The fact that the majority comes to a different conclusion furnishes singularly insufficent grounds for reversing that determination.
*448 Additionally, the majority expresses concern not only for the manner in which the in camera interviews with the children were conducted but also with the weight the trial judge accorded the results of these discussions. For support of this proposition, State v. Green, 129 N.J. Super. 157 (App. Div. 1974), is cited. Though Green does state that, in criminal cases, side-bar discussions must be recorded for purposes of a "meaningful review," that holding has no applicability to the instant case.
N.J.S.A. 9:2-4 provides, in pertinent part, that:
* * * If a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody, the court shall consider and give due weight to his wishes in making an award of custody or modification thereof.
Several private interviews were conducted by the trial judge, out of the presence of the parties and their attorneys, in order to determine whether Franceen and Joy had any preference with whom they wished to live. The record reveals that the majority of these sessions were at least partially recorded. Additionally, it is apparent that the trial judge adequately relayed the results of these interviews to the parties on the record. Furthermore, there was no objection to the procedure.
In Lavene v. Lavene, 148 N.J. Super. 267 (App. Div. 1977), certif. den. 75 N.J. 28 (1977), we had occasion to comment on the aforementioned statute (N.J.S.A. 9:2-4). There it was categorically stated that a child's desires or preferences on the issue of custody is:
* * * a factor which the court should consider along with all of the other relevant factors. The age of the child certainly affects the quantum of weight that his or her preference should be accorded, but unless the trial judge expressly finds as a result of its interview either that the child lacks capacity to form an intelligent preference or that the child does not wish to express a preference, the child should be afforded the opportunity to make her views known. We would think that any child of school age, absent the express findings *449 we have indicated, should have that opportunity and that the judge would be assisted thereby. [at 271-272]
See also, Mayer v. Mayer, 150 N.J. Super. 556, 563 (Ch. Div. 1977); Annotation, "Child's Wishes as Factor in Awarding Custody," 4 A.L.R.3d 1396 (1965).[2]
As to the manner in which an interview with the child is to be conducted, the court in Lavene states (148 N.J. Super. at 272) that that is a matter which "must be left to the trial judge's discretion." Though the court does remark, by way of footnote, (n. 1, at 272), that the "preferable procedure," where "practicable," may be to record the interview, that procedure is in no way mandated. The court states:
* * * A private interview out of the presence of the contesting parents and their attorneys may well be indicated in order to assure the child's freedom of expression. But the need for privacy does not constitute a warrant for total secrecy. The trial judge is clearly obliged to disclose for the record his findings as to the capacity of the child to express a preference. If he has concluded that the child has capacity, he must then state whether such an expression of preference was made. If the judge relies to any degree at all on the preference expressed, a matter which he must also state, then, of course, he must make known, at least in general terms, his reasons for such reliance and the extent thereof. [Ibid.; footnote omitted]
This was precisely the procedure followed by the trial judge, and thus there is no basis for the allegation that the defendant here may have been denied "an opportunity to be heard on the facts. * * *" Franceen, age 11 at the time of the proceedings below, categorically stated to the trial *450 judge on several occasions her absolute desire to live with her father, rather than stay with her mother. Surely, at such an age, her capacity to state such a predilection with certainty cannot be disputed. See Lavene v. Lavene, supra, 148 N.J. Super. at 274. This desire, as noted supra, was conveyed to the parties. It is also of some importance to note that her last interview with the trial judge was at the express request of defendant.
Joy, approximately 7 years of age at the time of the hearing, vacillated in voicing her preference. However, her choice, whatever it might be, must be discounted by her tender age and "capacity to reason," as mandated by our statute. Furthermore, as noted by the majority, Joy developed emotional problems which impaired her learning abilities, which also tends to lessen the weight to be given her wishes.
However, the predilections of the children were by no means the only factors the trial judge took into account in determining changed circumstances and in rendering his decision placing the children in the custody of their father.
In her testimony defendant candidly admitted to her homosexuality and to several ongoing relationships. She further stated that she actively attended homosexual clubs and bars.[3] Through her sexual preferences and activities defendant has succeeded in alienating all of her own relatives (parents, aunts, etc.), some of whom affirmatively testified on behalf of plaintiff.
Further, the trial judge took into account the instability of defendant's home due to her constant moves and attempts at "finding herself," as opposed to a more stable atmosphere plaintiff could provide. The court noted Franceen's expressed hatred of one of defendants companions, the fact that she is pressured by her peers and the material effect defendant's *451 relationships have had on Franceen[4] and the probability of the same result on Joy.
The record also reveals that as a result of defendant's relationships, the children were confronted with difficult and troublesome situations. For example, there was disputed testimony in the record which revealed that one of defendant's companions struck one of the children, which resulted in strained relations between the two lovers. Also, Franceen related to the trial judge an incident wherein the father of Diane, one of defendant's friends, actually "started shooting" with a gun, presumably because of her living with defendant.
In its entirety, the record supports the determination of the trial judge. Contrary to defendant's contention, it was not just the fact of defendant's sexual deviancy that prompted the judge to rule as he did, but rather it was all of the facts of the case, taken as a whole, which justified the finding of changed circumstances and placing the children, in their own best interests, in the care and custody of their father.
Adults have freedom of choice; children do not have a like freedom. They are impressionable and vulnerable. Adolescence is a time of turmoil, self-doubt and sometimes alienation. It is a time when the stability of a family is most important. Children should not be victims of an avant-garde tolerance that does not represent the thinking of the vast majority of society. I cannot conceive that the interests of these children will be best served by returning them to the custody of their mother, who gave this answer to the court:
THE COURT: Would you be satisfied to have your daughter enter a homosexual relationship?
*452 THE WITNESS: If that's where she was comfortable, I wouldn't be elated because of society's rules.
In balancing the assets and liabilities of the two households, Judge Gruccio determined that the interests of these children are best served by placing them in the custody of their father and his new family. I would affirm that determination.
NOTES
[1] As the dissenting opinion correctly notes, the court in that case limited a homosexual father's rights of visitation. However, in addition to the fact of the father's homosexuality the court also found that he was an active leader in the "Gay" movement, lived in a building occupied almost entirely by homosexuals, and had actually involved the children in his efforts on behalf of the homosexual movement. In the court's words,

They have accompanied him on protest marches, at rallies and were filmed with him for a television show which discussed homosexuality. They have been present with him at "The Firehouse", a meeting hall for homosexuals, where one witness has testified he observed men, "fondling each other, necking and petting." They have slept overnight at defendant's apartment while he slept with a male lover. The evidence and testimony also indicates that pornographic periodicals with a homosexual orientation are available to the children at defendant's residence. Both my interview with the children and the testimony at the hearing indicated that homosexuality and gay rights are a common if not the most common topic of conversation when the children are with defendant. [at 494-495]
Moreover, the court had before it psychiatric evidence that the children's healthy growth would be impeded by unrestricted visitation. It is clear that none of these considerations are present in the case at hand.
[2] Nowhere in the evidence is it suggested that this happened because of any fault on the part of defendant.
[3] His present wife, to whom he had delegated the duty of making the payments, stated she had no explanation for failing to do so "that would be excusable in this court."
[4] To the contrary, the transcript shows one recorded interview specifically held at Franceen's request because she wanted to correct an unfavorable impression about Joyce she had conveyed to the judge on an earlier occasion  unrecorded, so far as we can tell.
[5] We record the following responses to the dissenting opinion's treatment of matters which are factual in nature.

We find no basis for the conclusion that as a result of defendant's relationships, the children were confronted with difficult and troublesome situations. The incident in which Franceen was supposedly "struck" by Joyce was clarified in the interview with the judge which was volunteered by the child. As she explained, this occurred at her birthday party. She was quarreling with Joy and during the ensuing hair pulling altercation "Joyce put up her hand to stop me from hitting [Joy] and I ran into her hand." The reason she gave for blaming this on Joyce was that she was jealous of her sister Joy, "so jealous that I took it out on Joyce. That's the thing that I thought of to say, that Joyce hit me."
With respect to the "shooting incident," this involved a dispute in which defendant was in no way concerned. Diane was, so far as we can tell from an unclear transcript, defendant's landlady who lived in an adjacent trailer. She was not a homosexual and the reasons for which her father attempted to shoot her were unexplained. We find nothing to support the conclusion that this was "presumably" because she was living with defendant. In any event, defendant removed herself and the girls from that living situation because it was obviously unsuitable.
The dream Franceen had about Barbara cannot be characterized as "nightmares." All that this consisted of was a single incident in which she visualized Barbara lying in plaintiff's bathtub.
Defendant did not admit to "several ongoing relationships." According to the record, she was involved only with Barbara, and then with Joyce. Moreover, at the time of the hearing, the record shows only that defendant was visiting a private club two or three times a year.
Although it is correct that some of her relatives appeared as witnesses at the behest of plaintiff, the chief purpose of their appearance was to express their own disapproval of defendant's homosexual habits. However, they also gave affirmative evidence that she is without question a conscientious and capable mother.
[1] I would also point out that if the majority is not satisfied that the trail judge made sufficient findings of fact to support his determination, the case should be remanded to the trial level to give the court an opportunity to elucidate on its conclusions. See Lavene v. Lavene, 148 N.J. Super. 267 (App. Div. 1977), certif. den. 75 N.J. 28 (1977). Though I agree with the majority that this case has already been unfortunately protracted, I believe that a judgment as to who will receive custody of the children should not be based on an impersonal record, but should best be left to one who has "the advantage of the personal appearance of the parties and of discussions with the children" and has "the wisdom which comes from an accretion of experience in dealing with such matters." In re Flasch, 51 N.J. Super. 1, 18 (App. Div. 1958), certif. den. 28 N.J. 35 (1958).
[2] By erroneously relying on State v. Green, supra, the majority concludes that the express desires of the children should be totally ignored, in direct contravention of our statutes. Yet in the same breath the majority elevates "expert" testimony to a point where it supersedes the child's fears, predilections and needs. By so doing, not only does the majority dispense with express statutory mandate but also with the proper scope of our inquiry, i.e., whether the trial judge's determination was supported by the record.
[3] In response to inquiries from the trial judge, the defendant testified that she attended private homosexual clubs with Joyce both in Philadelphia and in Atlantic City.
[4] At one point in her testimony, defendant admitted Franceen had nightmares concerning Barbara, one of defendant's paramours. The defendant testified:

Question: Did Franceen ever indicate to you during any period of time that she was having certain nightmares regarding Barbara Guardella? Answer: Yes, she did.