▆

**M. J. P., Appellant,**

v.

**J. G. P., Appellee.**

No. 54897.

Supreme Court of Oklahoma.

Feb. 2, 1982.

---

Phil Frazier, Frazier, Smith & Farris, Tulsa, for appellant.

Jarboe, Thompson, Thornbrugh & Holmes by P. Thomas Thornbrugh, Tulsa, for appellee.

DOOLIN, Justice:

The question before us is whether this acknowledged, open homosexual relationship involving the custodial parent was shown by the facts to be sufficient change of condition to warrant modification of a child custody order? We answer in the affirmative. The factual situation is before us for the first time. Our decision is controlled, as in all custody cases, with protecting and providing for the best interests of the child.

The protagonists were divorced in August 1978. Custody of two-and-one-half-year-old son (J.) was given to mother. Within several months mother moved in with a female lover and her twelve-year-old son, C.; the two women established an acknowledged homosexual relationship, and went so far as to invite forty friends to a "Gay-la Wedding" in a church, performed by a minister. J. sleeps in the same room as his mother and her lesbian lover, although his bed is separated from theirs by a screen. The women admit to engaging in certain lovers' caresses (e.g. holding hands, kissing, touching) in J.'s presence. Mother testified she had talked to C. about her relationship with her lover and told him there was nothing immoral about two women being lovers and living together, that it is not immoral for two men to have a homosexual relationship, and that one day she would express those same thoughts to her own son, J. She said an explanation to J. of the strong commitment and love she and her lover have for each other would be in J.'s best welfare. She testified that if J.'s development was stifled in any way by her relationship with her lover, she would discontinue the relationship, that J. is "the most important thing" to her should it come down to a choice.

So, too, with this Court is J. "the most important thing."

Statute authorizes the trial court to modify a child custody order "whenever circumstances render such change proper...." See 12 O.S.Supp. 1979 § 1277. Case law mandates that prior to such modification there must be a showing that a "permanent, material and substantial change of circumstances or conditions of the parties, directly affecting the welfare of the child to a substantial or material degree, and as a result of which it would appear that the child would be substantially better off, with respect to its temporal welfare and its mental and moral welfare, if the requested change in custody were ordered by the court." *Gibbons v. Gibbons*, 442 P.2d 482 (Okl.1968).

This is a first impression case in Oklahoma; in fact there are relatively few like situations nationally.[1] A Massachusetts trial judge ruled that "the environment in which the mother proposes to raise the children, namely a lesbian household, creates an element of instability that would adversely effect the welfare of the children," but he was reversed by the appellate court which said that finding was insufficient to mandate a change in custody:

"A finding that a parent is unfit to further the welfare of the child must be predicated upon parental behavior which adversely effects the child. The State may not deprive parents of custody of their children 'simply because their households fail to meet the ideals approved by the community ... or simply because the parents embrace ideologies or pursue life-style at odds with the average." *Bezio v. Parenaude*, —— Mass. ——, 410 N.E.2d 1207 (1980).

During the *Bezio* trial a clinical psychologist testified "there is no evidence at all that sexual preference of adults in the home has any detrimental impact on children." The Appellate Court concluded there was a "total absence of evidence suggesting a correlation between the mother's homosexuality and her fitness as a parent."

1. For general treatment of the subject, see 100 A.L.R.2d 625.

Another custody case involving lesbian lovers occurred in Washington State[2] wherein the homosexual relationship was recognized in the divorce decree and was not appealed. In appeal of a later modification hearing the appellate court said there was insufficient change of condition to warrant a modification of custody at that stage because the issue of homosexual custody was not appealed in the original case.

The dissent in the Washington State case quoted from a law review article[3] which said the state does have an interest in the matter of heterosexual acts versus homosexual acts:

"In seeking to regulate homosexuality, the state takes as a basic premise that social and legal attitudes play an important and interdependent role in the individual's formation of his or her sexual destiny. A shift on the part of the law from opposition to neutrality arguably makes homosexuality appear a more acceptable sexual life-style, particularly to younger persons whose sexual preferences are as yet unformed. Young people form their sexual identity partly on the basis of models they see in society. If homosexual behavior is legalized, and thus partly legitimized, an adolescent may question whether he or she should "choose" heterosexuality. At the time their sexual feelings begin to develop, many young people have more interests in common with members of their own sex; sexual attraction rather than genuine interest often first draws adolescents to members of the opposite sex. If society accorded more legitimacy to expressions of homosexual attraction, attachment to the opposite sex might be postponed or diverted for some time, perhaps until after the establishment of sexual patterns that would hamper development of traditional heterosexual family relationships. For those persons who eventually choose the heterosexual model, the existence of conflicting models might provide further sexual tension destructive to the traditional marital unit."

Other jurisdictions have reached quite similar conclusions, as dramatized by a Utah decision:

"Although a parent's sexuality in and of itself is not alone a sufficient basis upon which to deny completely a parent's fundamental right, the manifestation of one's sexuality and resulting behavior patterns are relevant to custody and to the nature and scope of visitation rights."—*Kallas v. Kallas*, 614 P.2d 641 (Utah 1980).[4]

These decisions of our sister states have one common thread running through them: the determining factor should be the effect the homosexual relationship has on the child and if found to be detrimental to the child's well-being or an impairment to his emotional or physical health, the custody modification is allowed. In other words, our "best interests of the child" standard has been applied.

A study of the record reveals to us that the trial judge had a plethora of evidence upon which to ground his decision to modify custody of J. The witnesses at trial included the participants, members of their families, and Dr. Betsy Walloch who, as a psychiatrist specializing in child and adolescent psychiatry, had observed J. and his parents. Dr. W., in support of her opinion, testified to a study involving homosexual and heterosexual mothers which found "essentially no difference in the development of the children or the relationships between mothers and their children or generally the problems that the mothers were having in raising their children."[5] She opined a son

2. *Schuster v. Schuster*, 90 Wash.2d 626, 585 P.2d 130 (1978).

3. *"Constitutional Protection for Personal Lifestyles,"* by J. Harvie Wilkinson III and G. Edward White, 62 Cornell L.Rev. 563, 595–596 (1977).

4. Also see *In the Matter of J. S. & C.,* 129 N.J.Super. 486, 324 A.2d 90 (1974), for a study of the constitutional issues; *Chaffin v. Frye,* 45 Cal.App.3d 39, 119 Cal.Rptr. 22 (1975); *M. P. v. S. P.,* 169 N.J.Super. 425, 404 A.2d 1256, 100 A.L.R.3d 604.

5. "Heterosexual and Lesbian Single Mothers: A Comparison of Problems, Coping, and Solu-

raised in a homosexual home is *not* more likely to become a practicing homosexual than a son raised by a single woman living alone. She said children usually make their sexual identity between the ages of three and five, and J.'s is masculine. She said early adolescence is the next critical period for children and predicted that "in this case it would probably be twelve to fourteen years and this would be the difficult period for J." While she testified it would be in J.'s best interests to be left with his mother, she added: "I cannot predict whether or not there might be problems later on relating to mother's homosexuality. That would depend largely on how much friends are aware of it and whether or not he has problems from outside in relation to being teased by people making comments about it." She said if J. were questioned about his mother's homosexuality by his grandparents or his father, it would be "very detrimental" to him.

On cross-examination, Dr. W. acknowledged that it is in a child's best interests to be taught the prevailing morals of society, and that it is generally considered immoral for two women to engage in a homosexual life-style. She testified parents play an important role in teaching and inculcating in children the values of society. She said living with his mother in her present relationship, J. would have no idea that that behavior was not normally accepted by society, but that the example he sees at home is "very important" in his life.

She testified that homosexuals frequently combat the disapproving glances of others, and "very definitely" encounter prejudices against homosexuals, and that the children of homosexuals come into contact with these same feelings. She said these children are "felt sorry for and they would probably wind up in a position of having to defend the homosexual parent, which could get them into some difficulty with their peers and others. She agreed that one of the manifestations of defending his moth-

er's homosexuality would be to indicate that there is nothing wrong with it, that there is nothing immoral with it, and that there sometimes occurs a time in the life of such a child where society's morals collide with what he thought was right at home. Ultimately J. will have to make "a choice between his mother and society and somehow reconcile it within himself . . . ."

Dr. W. concluded: "Probably the greatest problem with it will be in early adolescence when he is very much aware of society's feelings. If he has been taught in some way that it is very sinful and he becomes aware of it, that could be as traumatic as growing up with it being somewhat normal and then finding out that society considers it wrong, but he is going to have to deal with it at that point either way. If he strongly believes that it is sinful and wrong, then he is going to be put in a position of rejecting society's rules, possibly his religion or his mother's, either of which is going to cause severe problems."

We find the above evidence of sufficient quality to sustain the trial court's decision that a change in conditions had resulted mandating a change in custody, in the best interests of the child.

Appellant contends the court erred by failing to disqualify itself, arguing the court was biased and prejudiced, and had predetermined the case. She cites several pages of testimony wherein the court questioned the appellant's lover and concluded the court had gone beyond the allowable bounds of cross-examination, already having formed its decision in the case.

We have reviewed the aforementioned testimony and find no evidence of appellant's conclusions. The trial court's questions evidenced a desire to learn more about the home and family life of a homosexual couple, and how it affected children; in effect to better understand the consequences of his ultimate decision, the custody

tions," by Mildred D. Pagelow, Journal of Homosexuality, Vol. 5(3), pages 189–204, Spring 1981. Also see "Social Attitudes, Legal Standards and Personal Trauma in Child Custody

Cases," by Donna Hitchens, J.D., Journal of Homosexuality, Vol. 5(1), 1979/1980, pages 89–95.

of the child. We fail to undercover even a scintilla of prejudice, and commend the trial court for its interest in making the correct decision for the child's best interests. On what could be described as a delicate subject, he treated the parties with great compassion, respect and dignity.

Appellant also objects to the manner, and the timing, of the trial court's decision in the case. At the conclusion of the attorney's closing arguments, the court read its decision from the bench, including two paragraphs which he read from a book he brought into the courtroom. Appellant contends that the reading from the book and the fact the decision was rendered without break in the trial, is evidence of prejudice of the trial court, and he should have disqualified himself at that point. She contends his acts were violative of the Oklahoma Constitution, Art. II, Section 6 and Art. VII, Section 2. We are not impressed.

AFFIRMED.

IRWIN, C. J., BARNES, V. C. J., and HODGES, LAVENDER, SIMMS and HARGRAVE, JJ., concur.

OPALA, J., concurs in part, dissents in part.