### Richmond

## JERONE WALTER WARD

v.

## JOHNNIE MICHAEL FAW, et al.

April 20, 1979.

Record No. 771166.

Present: All the Justices.

*John L. Gregory, III (Young, Kiser, Haskins, Mann, Gregory & Young, Ltd.,* on brief), for appellant.

*Ebb H. Williams III; Hoyett L. Barrow, Jr.* for appellees.

COMPTON, J., delivered the opinion of the Court.

Johnnie Michael Faw petitioned the court below for the adoption and change of name of Jerone Walter Ward, Jr. The child was the infant son of Faw's wife, Karen Rebecca Faw, who joined in the petition to indicate her consent to the adoption. Subsequently, the child's natural father, appellant Jerone Walter Ward, filed an objection to the adoption and was allowed to intervene in the proceeding. Following an *ore tenus* hearing and a subsequent private interview of the child by the trial judge, the court below, in the April 1977 order appealed from, approved the adoption and change of name, holding, *inter alia,* that the consent of the natural father was withheld contrary to the child's best interests. The sole issue on appeal is whether that finding was supported by the evidence.

The chronology sets the stage. The child's natural parents, natives of the Henry County area, were married in December of 1969. Ward had just embarked on a career in the U.S. Army. In April of 1970, the Wards began to have marital problems. The child was born in October of 1970 and lived with his parents at Fort Knox, Kentucky, until December of 1972, when the parties moved back to Henry County because Ward had been ordered to duty in Germany. The evidence showed that because of the parents'

marital difficulties, the child became sickly, pale, nervous and insecure. During that period the father was described as being authoritarian and a strict disciplinarian who demonstrated no affection for the child. The father disputed these charges.

Ward went to his new duty station in January of 1973 leaving his wife and child in Henry County. Returning for a two-week leave in September of 1973, Ward saw his son for one day during that period.

In December of 1973, in a divorce suit initiated by the mother, Ward was granted a divorce from bed and board on the ground that she had deserted him on September 3, 1973. The *a mensa* decree, later merged in September of 1974 into a final decree of divorce from the bond of matrimony, provided that the mother would have custody of the child, that Ward would pay $30.00 per week child support and that he would have reasonable rights of visitation with the child.

In October of 1974, the mother married Faw in Henry County. In February of 1975, Ward married another member of the Army. In February of 1976, he was transferred from duty in Germany and at the time of the hearing was stationed at Ft. Benning, Georgia. This proceeding was filed in September of 1976.

The evidence showed that although the child was adversely affected by the tension resulting from his natural parents' failing marriage, the boy's health improved after the mother married Faw, who provided a stable home for the mother and child. The evidence also revealed that the child became very affectionate toward his stepfather and that, at the time of the hearing in March of 1977, the boy did not know his natural father; the court below found that Ward was "a complete stranger" to his son. Ward, as of the time of the hearing, had not seen his son since the visit with him almost three and one-half years earlier in September of 1973. The evidence was in direct conflict as to why Ward had not visited the boy. The mother maintained that the father made no efforts to see him while the father claimed that his attempts to visit were frustrated by the mother's conduct.

The record also shows that during the period when Ward was separated from his son, he made the child support payments regularly, that he repeatedly mailed greeting cards on Christmas, at birthdays and upon other special occasions, and also forwarded

gifts to his son. No acknowledgment of any of these items was ever received by Ward from his son or from the mother.

When asked why he refused to consent to the adoption, Ward testified: "Because I love my son, that's why. And, he is me; he is part of me." On cross-examination, Ward admitted that, in a telephone call from a social worker investigating the case, he earlier had responded to the same question by stating that the boy was his only son and that he wanted his name to be "carried on".

The pertinent statute dealing with a natural father's consent, under the circumstances of this adoption, provided, in part, that if the trial court finds after hearing evidence that the father's consent is withheld contrary to the best interests of the child, the court may grant the petition without such consent. Code § 63.1-225(4) (1977 Cum. Supp.).

Addressing the child's best interests, the trial judge stated in a memorandum opinion incorporated by reference into the final order that:

> The Court finds that the subject child is now living in a stable home, has love and care, and the child is a happy, healthy, outgoing, and well adjusted six year old boy. The fitness of the adoptive parents is unquestionable. The Court has considered the finality of adoption as it relates to the natural father. However, since the natural father has not established a familial or custodial relationship with his son, they are strangers at this time. It is unknown as to what type of relationship the natural father and his new wife would have with this child or what relationship the child would have with them, or how the child would react when he finds out about his natural father. To deny the adoption and take the child from a stable and happy environment and expose him to the natural father through his visitation rights would be in essence for the Court to experiment with the future welfare of this child. It could work and benefit all concerned or it could have a very devastating effect upon this child. Such an experiment has too much uncer-

tainty for this Court to gamble with the welfare and happiness of this child.

 We do not agree with the argument of the adoptive parents that the court below correctly ruled that the adoption should proceed absent the father's consent. We think this case is controlled by *Malpass v. Morgan*, 213 Va. 393, 192 S.E.2d 794 (1972).

The facts in *Malpass* are similar to the facts here. In that case, the natural father objected to the adoption of his six-year-old son by the child's stepfather. After the final separation of the natural parents, the child remained with the mother. The evidence was in conflict concerning the father's contacts with and support of the child during the period following the parents' separation. The mother claimed the father failed to provide support and sought to see the child only occasionally. The father claimed that he provided some support and that the mother's conduct frustrated his efforts to see the child. When the mother· was granted an absolute divorce, she was awarded custody of the child and the father was allowed visitation rights. Upon remarriage, the father moved from Virginia to Ohio with his new wife and returned to Virginia twice each year over a period of four years to visit the child. Upon receiving notice of the proposed adoption, the father moved back to Virginia to contest the proceeding and commenced to exercise full visitation rights granted him in the divorce decree.

In *Malpass*, there was no claim that any of the parties were unfit parents. Also, the evidence revealed that both homes would provide a proper atmosphere for raising the child.

In that case, construing the burden imposed on the adoptive parent by Code § 63.1-225(4), we said that when "there is no question of the fitness of the non-consenting parent and he has not by conduct or previous legal action lost his rights to the child, it must be shown that continuance of the relationship between the two would be detrimental to the child's welfare." 213 Va. at 399, 192 S.E.2d at 799. We further stated that while in adoption cases the welfare of the child is of paramount concern, nevertheless in such a contest between a parent and non-parent, "the rights of parents may not be lightly severed but are to be respected if at all consonant with the best interests of the child." 213 Va. at 400, 192 S.E.2d at 799.

 In the present case, there is no finding that the natural father is an unfit parent, nor indeed would such a finding be supported by

the evidence. Likewise, the evidence fails to show that by conduct or previous legal action, Ward has lost his rights to the child. Thus, the burden was on the adoptive parent to establish by the evidence that continuance of the relationship between the father and child would be detrimental to the child's welfare. This burden has not been carried.

In seeking to distinguish *Malpass* from this case, the adoptive parent and the mother contend that the father in *Malpass* "had established a close familial relationship with his son," but they point out that here the father is "a total stranger" to the boy. They argue that *Malpass* "assumes that there is an established relationship between the natural father and son" and that here, "such a relationship is non-existent." But the Faws ignore the facts that Ward has regularly contributed to the support of the child and has repeatedly mailed greeting cards on Christmas, at birthdays and upon other special occasions, and also forwarded gifts to his son.

Also overlooked by the Faws is an important aspect of "the relationship" contemplated in *Malpass*. The "relationship" to be examined is not limited to a social, familial, or custodial connection which may exist between the child and the non-consenting parent. Consideration should also be given to the legal affiliation always present between parent and child.

Thus, we see that the full breadth of the parent-child connection in all its dimensions must be studied before it can properly be determined that parental consent is withheld contrary to the best interests of the child. And in connection with such a study here, the record is devoid of any evidence to establish that continuation of the present limited relationship between Ward and his son, or indeed that any expansion of such relationship which may occur in the future, will be disruptive of the child's well-being.

██ Finally, the trial judge expressed the view, endorsed by the proponents of the adoption, that to "expose [the child] to the natural father through his visitation rights" would amount to an "experiment with the future welfare of this child" which "could have a very devastating effect upon this child." But as we have just indicated, there is no evidence in the record to support that conclusion. One can only speculate upon the effect this son's contact with his father will have upon the child. Conclusions unsupported by facts are insufficient to sever for all time the legal connection between parent and child.

For these reasons, we hold that the evidence is insufficient as a matter of law to support the adoption. Accordingly, the order appealed from will be reversed and the petition for adoption and change of name will be dismissed.

*Reversed and dismissed.*