### Richmond

JANE DOE

V.

JOHN DOE AND ANN SMITH DOE

December 4, 1981.

Record No. 790824.

Present: All the Justices.

738

*Marcia Robinson Lowry (Victor M. Glasberg; Stephen W. Bricker; Gerald T. Zerkin; Bricker and Zerkin,* on briefs), for appellant.

*David A. Melesco (Melesco and McLaughlin, P.C.,* on brief), for appellees.

HARRISON, J., delivered the opinion of the Court.

In this adoption case the Court considers the effect of an admitted lesbian relationship by a natural mother who refuses to consent to the adoption of her child.

Ann Smith Doe petitioned the court below for adoption of Jack Doe. The child is the infant son by a former marriage of Ann's husband, John Doe, who joined in the petition and consented to the adoption. Code § 63.1-221, *et seq.* Appellant Jane Doe, the child's natural mother, filed her answer and registered her opposition. Investigations were made by the Franklin County Department of Social Services and by the Children Services Board of Greene County, Ohio. Their reports are a part of the record. Following an *ore tenus* hearing, the court below approved the adoption, holding, *inter alia,* that the consent of the natural mother was withheld contrary to the child's best interest. Jane contends on appeal that the court's finding is not supported by the evidence.[1]

The law which controls our decision is well settled. In *Cunningham v. Gray,* 221 Va. 792, 795, 273 S.E.2d 562, 564 (1981), we said: "[W]hile the welfare of the child is of paramount concern in adoption cases, nonetheless the rights of a natural par-

---

[1] Because of the conclusion we reach, it is unnecessary to consider appellant's other assignments of error or the constitutional issues raised.

ent vis-a-vis a non-parent will be maintained if at all consistent with the child's best interests." *Accord, Malpass* v. *Morgan,* 213 Va. 393, 400, 192 S.E.2d 794, 799 (1972); *Walker* v. *Brooks,* 203 Va. 417, 421, 124 S.E.2d 195, 198 (1962). The adoptive parent must establish that "continuance of the relationship between the [natural parent] and [the] child would be detrimental to the child's welfare." *Ward* v. *Faw,* 219 Va. 1120, 1125, 253 S.E.2d 658, 661 (1979). We honor these principles in our evaluation of the evidence in the instant case.

Jane was raised in a small town in Ohio and was educated at Wooster College (BA degree) and Vanderbilt University (MA degree). She and John met while she was attending graduate school, and they were married in June 1967. The first three years of their married life were uneventful, and during that time Jane taught school and worked in research while her husband attended graduate school. In the summer of 1970, John honored his commitment to the Army, having previously participated in a ROTC Program. Apparently, he had ambivalent feelings about the Vietnam War and the Army generally. Jane stated that he became depressed and cynical and turned to alcohol for relief, thereby bringing about a situation which neither could handle, and which caused their marriage to suffer. Jack was born in Washington, D. C. in June 1971.

John obtained an early release from the Army in June 1972, and Jane said that they and their infant son spent the summer on a farm in Arkansas to "get our life back together." In August the parties moved to Yellow Springs, Ohio, where John obtained a job in a social service agency. Shortly thereafter the parties separated with both continuing to live in Yellow Springs. Their infant son remained with Jane, who was employed.

According to Jane, her husband led a rather aimless life for approximately two years after their separation, being generally unemployed and providing her with little child support. In 1974, John, who holds a PhD degree, left Yellow Springs to accept a job at Ferrum College in Virginia. This apparently marked a turning point in his life. At the time this case was tried he was a tenured professor at Ferrum.

In April 1975, John obtained a divorce from Jane, and shortly thereafter remarried, established a home in Rocky Mount, Virginia, and had a child by Ann, his second wife. Following his father's remarriage, the boy continued to live with his mother in

Yellow Springs but periodically visited his father in Virginia. In February 1976, John and Ann, over Jane's objection, took the child to Virginia. Thereafter John sought and obtained permanent custody of the child in July 1976, but with Jane having visitation rights. Two years later the petition for adoption was filed. The hearing in this case was held in October 1978, and a final order of adoption was entered on March 5, 1979.

The custody of Jack Doe is not an issue here. In a previous proceeding it was ordered that he spend eight weeks of his summer vacation with his mother and alternate Easter and Christmas vacations with her. The rest of the time was to be spent with John and Ann. Neither is the fitness of John and Ann Smith Doe as parents, or as adoptive parents, an issue.

John and Ann both testified at the *ore tenus* hearing before the court below. They assigned as reasons for Ann's desire to adopt the boy "the separation between Franklin County and Yellow Springs, Ohio," and the difference in life-styles between the two areas.[2] They described their life-style at Ferrum as that of a "rural extended family," and the life-style at Yellow Springs as different, unordered, unstructured, and bohemian. Both expressed a desire to solidify their family unit by having Jack as a permanent member and expressed concern over the relationship between Jane and the woman with whom she lives in Ohio. They admitted that Jack "has not verbalized" any difficulties that he had in accepting the relationship between his natural mother and her friend. However, John testified that "at some point he will have to attempt to integrate these two life styles," referring to the difference between the family unit maintained by him and Ann and that by Jane.

Helen Brown, Jack's teacher, described the boy as well-adjusted, above average in intelligence and verbal ability, creative, happy, sensitive, and cheerful.

Jane Doe testified fully and freely regarding her relationship with a woman in Yellow Springs named Moya whose child is named Jason. She described their association as "married in the sense that we have a primary relationship and that we have committed ourselves to living our lives together and to supporting each other." She said that the marriage was spiritual, and that they went through a ceremony in the presence of a Sufi priest "because

---

[2] It appears that since this case was tried in the court below John and Ann have moved from Franklin County to South Carolina. *See John Doe and Ann Smith Doe v. Jane Doe, etc.,* _ F.2d _ (4th Cir. 1981).

we wanted to acknowledge the importance of our relationship," one which she admitted was sexual at times.

Jane was questioned closely about the effect of her son growing up in two households, one where there is a husband and wife relationship and the other a homosexual relationship between two women. She responded, "I don't see any conflict" and added significantly: "If at any point I did see a conflict I would do whatever I had to do, which would include severing a relationship with Moya or anyone else for Jack's sake." When pressed further on the possible harmful effect of her lesbian relationship, she said: "I have felt that there's no harmful effect, and, as I say, if I ever was given any reason through any indication on Jack's part, either verbally or some response that he had that, that there was a difficulty for him, I would do something about it, whatever seemed appropriate." When asked if she would give up Moya, she said: "I would not live with her. The friendship is a friendship that, you know, I certainly wouldn't give up." Jane testified at great length about her love, affection, and concern for the boy, their closeness, the trips they took together, the experiences they shared, including their living in an Indian teepee one summer, visiting in California, hiking, and teaching the boy to swim and ride a bicycle.

Jane admitted that she permitted her son to call her by her first name, that when they once lived in a two-story house she did not discourage Jack when he urinated from an upstairs window, and that she was not shocked when he and Jason used a four-letter "barnyard" word. She testified that the use of such words by very young children usually coincided with a phase through which they passed and were used by them to get a reaction.

Among the witnesses from Ohio who testified to the fitness of Jane to be a mother was Mary Jackson, John Doe's first cousin, and the mother of a two-year-old son. Her husband is a professor at Wright University, and Mrs. Jackson holds a Masters degree and is employed as a professional counselor. She has known Jane Doe for six years. She described Jane's relationship with Jack as "very loving and nurturing" and noted the two had a "very good and close rapport." Mrs. Jackson attributed this to Jane's "thoughtfulness, consideration, and interest as a parent," observing that Jane had provided Jack with "loving and learning and educational experiences." She described these experiences as visits to libraries and to zoos, outdoor activities, camping, making homemade toys for him, making his clothes, and being very concerned

about his welfare in general. She admitted having reservations about Jane's life-style but added: "I find that the lifestyle does not in any way take away from her ability as a parent. . . . I have always seen her put Jack first and always consider him before she considered other things in life. I think she's a very admirable and confident parent."

In Mrs. Jackson's opinion, Jack would not experience any problems in going from a rural heterosexual family relationship to the life-style practiced by his mother in Yellow Springs. When asked if the boy would not be subjected to cruel comments by his peers because of his mother's life-style, Mrs. Jackson admitted this was a possibility but added "my experience with Jack is that he is a self-assured child and would talk that out with either of his parents at the time, if that occurred, and could handle it. . . as any well adjusted child could handle it, I believe." When asked by the court if there was not a responsibility to shelter children from the life-style followed by Jane, she answered: "I think that would be, in the world we live in today, a too protective stance because our children today are exposed to so many things in such a fast changing world. . . . I wouldn't see that as being necessarily desirable."

James Johnson, a teacher, and the father of a five-year-old daughter, testified that he had known Jane and Jack for five years. He said that Jane "is a very conscientious and a very creative parent, someone who enjoys taking care of her children and yet is relaxed about it as well. . . . I've learned a lot about parenting by knowing Jane." He said he did not think Jane's life-style affected her relationship as a mother, observing: "I see them as two completely different things, one as being a parent and the other as how you live your life in terms of relationships." When asked if Jane was accepted and welcomed in homes in Yellow Springs, he answered: "Because she is so community oriented and so friendly in nature, she is accepted by everyone for who she is, and her lifestyle is not interrogated or questioned."

Robert Jones, a resident of Yellow Springs, who taught for seven years at a branch of Ohio State University, and before that at Chicago City College and the University of Illinois, testified that he had known Jane and her son for six years and described her as "a terrific mother." He said: "There's no doubt that she's a very loving mother, very responsible mother. My children have played with Jack and are friends. . . . I feel like my wife has

learned a lot from her as a mother, and I think it's been really helpful for our children to have that association [with Jane and Jack]."

Susan Miller, a Yellow Springs housewife, the mother of a daughter and two sons, is married to a member of the faculty of Antioch College. In describing Jane's relationship with her son, Mrs. Miller testified that Jane was very interested in Jack's education, in the boy's caring about other people, about animals, and about his friends. She said the relationship between mother and son was "on a very high level" and that she was always doing things with him that helped him develop and grow. Mrs. Miller felt that Jane had done more creative things and put more effort in Jack's development than she had with her own children. She said that she had never seen any public display by Jane that caused her any concern for any children in Jane's care. When questioned about the problems Jane's life-style might create for Jack, she said the cruelty of being deprived of a natural mother's association was far greater than any cruelty that could be inflicted on him by his peers. She said that no one shunned Jane in Yellow Springs and that "she's very much respected."

The original record contains a notarized letter to the trial judge from Meredith Dallas, a member of the faculty at Antioch College, who described himself as sixty-one years old, married, with four children. He had resided in Yellow Springs for thirty years. He admitted having serious questions about homosexuality as a sexual orientation but agreed with a recommendation (which he wrote was made by the American Psychological Association) that a parent's sexual orientation should not be either the sole or primary variable to be considered in determining a child's custody. He said the primary consideration in determining the welfare of the child is the love and care of the natural mother. Dr. Dallas wrote that he had known Jane and Jack well for six years. He thought that while her life had not been easy, she had met "difficulty after difficulty with determination and invention." He described her as "quiet and mild" but one who has "grit and an unquenchable optimism." He referred to Jane's love for the child as "a nurturing love" and said she exercised "a selfless wisdom" in caring for the child. He said that Jack was "the focus" of Jane's attention and love which he described as an "instinctual mother-love enhanced by intelligence and sensitivity."

Pursuant to an order of the court below, and in accordance with Code § 63.1-223, the Franklin County Department of Social Services made an investigation of the matter of the adoption of Jack Doe and reported to court, after having caused a copy to be served upon the Commissioner of Public Welfare. The report contains much of the information and facts testified to by the witnesses. The Agency concluded: "The agency cannot make a recommendation at this point although it appears the present living arrangement and visits with the natural mother are in the child's best interest."

At the request of the Franklin County Department of Social Services, the Greene County (Ohio) Children Services Board made its investigation of Jane Doe and submitted its report. This report contains much of the information detailed by the witnesses. It refers to Jane Doe as "a stable, thoughtful individual." It continued, saying: "She is financially stable, handles responsibility well, is very serious about her parenting and works to make every situation a learning experience for . . . [Jack] as well as herself." It reported that there was no indication of drug abuse in the house shared by Jane and Moya. Its conclusion was that Jane "appears to be a very responsible and competent individual. She is very sincere in her desire to care for [Jack] and from all indications, is very capable of providing him with proper parenting. She also appears very aware of the ramifications of her life style and works to provide . . . [Jack] with an objective viewpoint of life, as opposed to anything else."

On January 24, 1979, the Commissioner of Welfare of the Commonwealth of Virginia made his evaluation and recommendation to the court in which he recommended that the petition for adoption be denied after having said: "Since the natural mother wishes to retain her rights to the child and maintain her relationship with him, it is the Commissioner's conviction that it is in the best interest of the child that this adoption not be granted. The petitioners have presented no reason that this adoption should be granted that would outweigh the benefit the child may receive in continuing his legal and personal relationship with his mother." Later, on February 6, 1979, and after careful consideration of the investigative report of the Franklin County Department of Social Services, correspondence received by that agency from the natural mother, and the report of the Children Services Board of Greene County, Ohio, the Commissioner continued of opinion that the

best interest of Jack would be served by his having regular visits with his mother. However, the Commissioner recommended that the court enter the order which it deemed to be in the best interest of the child.

The trial court permitted the adoption and severed all parental rights of Jane Doe upon the ground that:

> [T]he open lesbian relationship now engaged in by Jane Doe, and which relationship she says will continue, would have a definite detrimental effect on Jack if he is permitted to visit and live with his mother, especially during his formative years and that his being exposed to this relationship would result in serious emotional and mental harm to this child, and that his best interest will be promoted by the adoption.

We first observe that the evidence establishes clearly and convincingly that Jack Doe, now in his eleventh year, is a well-adjusted boy, above average in intelligence, creative, happy, and sensitive. Obviously he has not heretofore been scarred or adversely affected by the conduct of either parent.

Although there was testimony that her relationship with the woman with whom she lives is unorthodox, the testimony is also that Jane Doe is an exceptionally well-educated, stable, responsible, and sensitive individual. Witnesses described Jane in various ways, but always in a highly complimentary manner. They referred to her as a conscientious and creative parent, friendly by nature, who instills in the boy a love for other people and for animals. It was testified that Jane's love for Jack was a nurturing love, and that she exercised a selfless wisdom in caring for him. Jane Doe has apparently earned the respect of her peers in Yellow Springs because of her civic work and active interest in the community and her relationship with the people with whom she comes in contact.

Again, aside from the lesbian relationship involved here, the petitioners were unable to give any valid reason why this woman should be permanently deprived of her child. While it is understandable that John and Ann would like to "solidify their family unit" by adopting Jack, this is not a compelling reason for an adoption. They point to the distance between Franklin County, Virginia, and Yellow Springs, Ohio, and complain of the difficulties involved in transferring the child for visits. This inconvenience cannot be attributed to Jane's living arrangement, but rather it

grows out of the fact that John and Jane Doe are divorced and now live in separate states. This is an inconvenience experienced by all divorced parents where there is divided custody of children.

If Jane Doe is an unfit parent, it is solely her lesbian relationship which renders her unfit, and this must be to such an extent as to make the continuance of the parent-child relationship heretofore existing between her and her son detrimental to the child's welfare. The petitioners introduced no evidence, scientific or otherwise, to establish this fact. Regardless of how offensive we may find Jane's life-style, its effect on her son's welfare is not a matter of which we can take judicial notice. We take judicial notice of generally known or easily ascertainable facts. *Ryan v. Commonwealth,* 219 Va. 439, 247 S.E.2d 698 (1978).

Petitioners argue that Jane has forfeited the right to have her child and that her admitted unorthodox conduct gives rise to a conclusive legal presumption that she is unfit to continue as Jack's mother. They say harm to him necessarily will result. Counsel for petitioners concede that he is asking this Court to hold that a woman who is a lesbian and a man who is a homosexual are *per se* unfit to be parents. He points to Code § 18.2-361, which makes it a criminal offense for a woman or man to engage in such a relationship. If we follow this argument to its logical conclusion, we soon would be considering whether a convicted murderer, rapist, robber, burglar, habitual offender, or some other lawbreaker, whose conduct is unlawful and whose life-style is dangerous to himself, his family, and the public generally, should be declared unfit *per se* as a parent and his children made fair targets for adoption.

The most drastic and far-reaching action that can be taken by a court of equity is to enter a final order of adoption. Such an order severing the ties between a parent and a child is as final, and often as devastating, as though the child had been delivered at birth to a stranger instead of into the arms of its natural mother or father. Custody of children and child support are matters that remain within the breast of the court and are subject to change and modification so long as a child is a minor. This is not true of adoptions. Once an order of adoption becomes final, the natural parent is divested of all legal rights and obligations with respect to the child, and the child is free from all legal obligations of obedience and maintenance in respect to the natural parent. The child, to all intents and purposes, becomes the child of the person adopting

him or her to the same extent as if the child had been born to the adopting parent in lawful wedlock. Code § 63.1-233.

■ While in both adoption and custody cases the primary consideration is the welfare and best interest of the child, it does not necessarily follow that the natural bond between parent and child should be ignored or lightly severed. On the contrary, this bond should be accorded great weight. We should apply neither the fitness test nor the best interest test to the exclusion of the other. We must determine whether the consequences of harm to the child of allowing the parent-child relationship to continue are more severe than the consequences of its termination.

■ The trial court held that Jane's lesbian relationship would have a detrimental effect on Jack and would result in serious emotional and mental harm to the child. We do not agree that the testimony supports this conclusion. The evidence shows only that Jane is a competent, capable, devoted mother, who is living in a lesbian household. There is no proof that Jack has yet been harmed by this fact. What the future holds for him is unknown, and on this the evidence introduced by the petitioners sheds no light. In *Bezio v. Patenaude,* 410 N.E.2d 1207 (Mass. 1980), a mother, who maintained a lesbian relationship, sought to remove a guardian and regain custody of her two natural children. The court found that there was a total absence of evidence suggesting a correlation between a mother's homosexuality and her fitness as a parent. It decided that a state may not deprive parents of custody of their children simply because their households failed to meet the ideals approved by the community or because the parents embraced ideologies or pursued life-styles at odds with the average, and said:

> The judge's finding that "[t]he environment in which [the mother] proposes to raise the children, namely a Lesbian household, creates an element of instability that would adversely effect [sic] the welfare of the children" is also insufficient to support the judge's conclusion that custody should remain in the guardian. Our reading of the record does not support an inference that the mother's lesbianism would render her unfit to further her children's welfare. Both parties introduced evidence to the effect that a mother's sexual preference per se is irrelevant to a consideration of her parenting skills. Dr. Alexandra Kaplan, a clincial psycholo-

gist and professor of psychology at the University of Massachusetts, testified as follows: "[T]here is no evidence at all that sexual preference of adults in the home has any detrimental impact on children. . . . [M]any other issues influence child rearing. Sexual preference per se is typically not one of them." Defendant's counsel questioned further: "[T]here is nothing to prove that a homosexual relationship would make or in any way influence a child to be a homosexual rather than a heterosexual?" Dr. Kaplan responded: "Quite [to] the contrary. . . . [M]ost children raised in [a] homosexual situation become heterosexual as adults. . . . There is no evidence that children who are raised with a loving couple of the same sex are any more disturbed, unhealthy, maladjusted than children raised with a loving couple of mixed sex. [Sexual orientation of the parent] is irrelevant to [the child's] mental health." Psychologist David Johnson, a defense witness who had seen the children in play therapy, concurred with Dr. Kaplan's opinion that homosexuality per se is irrelevant to parenting ability.

410 N.E.2d at 1215-16.

We decline to hold that every lesbian mother or homosexual father is *per se* an unfit parent. However, this is not to be construed as approving, condoning, or sanctioning such unorthodox conduct, even in the slightest degree. Jane's unnatural lifestyle was a proper factor to have been considered in determining her fitness as a mother and what was in the best interest of the child. It is not determinative in the case under review because, standing alone as it does, proof of Jane's unorthodox life-style did not outweigh the clear and convincing evidence that she is a devoted mother and, in every other respect, a fit parent. Further, in determining her fitness as a mother and the future welfare of her son, we are not unmindful of her testimony that should it become necessary, for her son's sake, she would sever the relationship with the woman with whom she now lives. There may come a time when the welfare and best interest of her son require that she honor this commitment.

The order of adoption entered by the lower court is reversed, and the petitioners' petition for the adoption of Jack Doe is dismissed.

*Reversed and dismissed.*

CARRICO, C.J., dissenting.

In *Malpass v. Morgan,* 213 Va. 393, 192 S.E.2d 794 (1972), we said that the adoption of a child should not be ordered over the protest of a parent unless "continuance of the relationship between the two would be detrimental to the child's welfare." 213 Va. at 399, 192 S.E.2d at 799. In the present case, the trial court found specifically that continuance of the relationship between Jack Doe and his mother "would have a definite detrimental effect" on the boy. I believe the evidence supports this finding and justifies the trial court's conclusion that the mother's consent was withheld contrary to the best interests of the child. Accordingly, I would affirm the order of adoption.

THOMPSON, J., joins in this dissent.