## CIRCUIT COURT OF HENRICO COUNTY

In re Adoption of
Robert Leslie Slayton

March 15, 1982

By JUDGE E. BALLARD BAKER

This is an adoption proceeding brought by James Garland Slayton, Jr. and his wife, Janice, for the adoption of Robert Leslie Slayton, born January 21, 1971.

James Slayton is the uncle of Robert.

The Report of Investigation reveals that Robert's parents separated in early 1973 and Robert lived with an aunt and then with his grandparents. The natural father also lived in that home. When the grandparents became ill, the father asked James and Janice to take the child. They did. Robert has been with them since February 1974, and they have had legal custody under an order of the Chesterfield County Juvenile Court since November 7, 1974. Cheryl Cousins, the mother, was present at the custody hearing.

This petition for adoption was filed on May 27, 1981. The natural father has consented. Cheryl Cousins, has not consented and appeared in opposition to the adoption at an ore tenus hearing on February 5, 1982.

Janice Slayton testified the mother had visitation rights every third Saturday of each month for 1½ hours, and came regularly until October 1978. The mother has not visited since then, but has made telephone calls on three or four occasions, sometimes around 5:00 or 6:00 A.M., asking when she could see the boy. She would be told at the next monthly visit, but she did not come. The mother did call and talk with Rob at Christmas in 1980. There have been no letters or cards, nor has the mother ever provided or offered any financial support.

The mother admits she has not seen Rob for "quite a while", and that she has sent no birthday or Christmas cards. She claims that she went by the Slayton home one Saturday in the early Winter of 1981, and was told she could see him that weekend. She says she went by that weekend and no one was there. She called and found the phone number had been changed. Since then she made no effort to see Rob nor has she ever returned to the Juvenile Court to enforce or improve the visitation. As to the cards, she admits sending none, but says she thought the Slaytons would not let him have them. No reason for this statement was given. She has at all times known the Slayton's address. She testified that she has been in this area constantly since 1973.

Mrs. Slayton also testified that after each visit made by his mother, Robert would "test" Mrs. Slayton with anger, or ignore her, this being contrary to his usual behavior. After the mother's visits stopped in October 1978, this behavior improved noticeably. Robert mentioned her occasionally after the visits stopped -- why did she not visit him, -- but had not mentioned her for over one year before the adoption petition was filed in May 1981.

Robin Tyer, a Henrico County school teacher who works with emotionally disturbed children, first met Rob in December 1977 when he was in the first or second grade and making slow progress and having classroom difficulty. He had many problems with his peers. He was placed on a "modification behavior" program, and at the outset was sent from his classroom two or three times a week. He showed gradual improvement under the program, and at the present time is on his age grade level, is never sent from the classroom, and performs above average. She sees him each day for thirty minutes in a jogging class, but not for any emotional disturbance. Rob did mention his mother to her the week before the hearing. He hoped to stay with the Slaytons, and expressed the thought that Ms. Tyer would see his mother in Court.

Dr. Wesley Carter, a medical doctor specializing in adult and child psychiatry, examined Robert on January 11, 1982, and interviewed the Slaytons. He also had notes of Dr. Horn who saw Robert a year before. Dr. Carter found Robert to be emotionally stable, though easily

distracted; he sees the Slaytons as his natural parents and Cheryl Cousins as a "nice lady who did bring presents" but not as a maternal figure. Robert had improved since seen by Dr. Horn; he was no longer insecure but had improved self-esteem and more confidence.

Dr. Carter stated that if contact with the mother was renewed, Robert might return to some of his earlier behavior, but this could not be proven. Robert said nothing in the interview to so indicate. However, Dr. Carter said this would involve a chance. If there is no contact with the mother, then there would be no problem, but if Robert questioned whether his mother could try and get him back, that might cause disruption.

Cheryl Cousins, expressing her opposition, was glad Robert was in a good home and felt the Slaytons took care of him. She did not want to give up all rights to her child, she would like better visitation, she wants to help make decisions in his life and she would like to apply to regain custody.

At the time of the hearing, Mrs. Cousins was confined in the Richmond City jail, having been arrested on November 4, 1981, and subsequently convicted on four forgery charges. Similar charges are pending in other jurisdictions.

The Slaytons first argue that Mrs. Cousins has abandoned the boy, relying heavily on the felony convictions and citing three cases. Of these, *Watson* v. *Watson*, 330 So. 2d 848 (Fla. 1976), is closest in point. There, nine months in jail was held, under the circumstances, to be the result of voluntary action by a mother and an abandonment in an adoption case by the father and step-mother against the will of the mother. The other cases, *Hamby* v. *Hamby*, 216 S.E.2d 536 (S.C. 1975), and *Thomas* v. *Culpeper*, 356 So. 2d 656, involve substantial longer periods of incarceration than have yet been imposed on Cheryl Cousins.

The Virginia statute, V.C. 63.1-225, does not state that parental consent is not required if there has been an abandonment. To do away with parental consent the residual parental rights must have been terminated by appropriate order or it must appear that "consent . . . is withheld contrary to the best interests of the child or is unobtainable . . ." This case comes down to whether

the consent of Cheryl Cousins is being withheld "contrary to the best interests" of Robert.

Virginia law on this point is well-settled. *Doe v. Doe*, 222 Va. 736 (1981), referring to 3 Virginia cases, says:

> The adoptive parents must establish that "continuance of the relationship between the [natural parent] and [the] child would be detrimental to the child's welfare."

In *Doe v. Doe*, *Cunningham v. Gray*, 221 Va. 792 (1981), *Ward v. Faw*, 219 Va. 1120 (1979), and *Malpass v. Morgan*, 213 Va. 393 (1972), the Court held the evidence insufficient to establish that the continued relationship would be detrimental. This requires consideration of those cases with this.

*Doe* is not really comparable. The holding there was that evidence that the mother had a lesbian relationship was not sufficient to show a detrimental effect on a boy seven years old at the time of the trial court hearing. No evidence was presented that this relationship made "the continuance of the parent-child relationship heretofore existing between her and her son detrimental to the child's welfare." (222 Va. 746). The Supreme Court found the boy:

> now in his eleventh year, is a well-adjusted boy, above average in intelligence, creative, happy and sensitive. Obviously he has not heretofore been scarred or adversely affected by the conduct of either parent. (222 Va. 745).

It also appears that the mother had custody of the boy until July 1976 and was granted visitation, including eight weeks in the Summer. The Supreme Court referred to:

> clear and convincing evidence that she is a devoted mother, and, in every other respect, a fit parent. (222 Va. 748).

*Cunningham* involved a girl, nine years old at the time the trial court ordered adoption without the consent

of the father. The father was shown to have a poor employment record, had been convicted of a minor crime, had not paid support after he and the mother separated, and had seen the child only once since 1973 at the time of the hearing in 1978. The father and mother disputed what efforts he made to see the girl after the mother moved to Virginia from New Jersey in 1973. The Supreme Court held that the father's conduct had not amounted to forfeiture of his parental rights and commented on his request to have support arrearages assessed and to have specific visitation established.

> The record here . . . is completely devoid of any evidence that continuation of the present limited relationship between Cunningham and his daughter, or any broadening of that relationship which may occur in the future, will be disruptive of the child's well-being. The evidence shows that friction exists between the natural parents, that in the past the father's occasional violence toward the mother upset the child, that the father has a poor employment record, and that he has been convicted of a minor crime. But there is no evidence which supports a finding that those negative factors will have a definitive adverse effect on the child's welfare if the father-daughter relationship is continued. (221 Va. 795).

*Ward*, involved a boy not quite seven years old at the time the trial court allowed adoption by the mother's second husband over the objection of the father. The following gives the nature of the case:

> In December of 1973, in a divorce suit initiated by the mother, Ward was granted a divorce from bed and board on the ground that she had deserted him on September 3, 1973. The a mensa decree, later merged in September of 1974 into a final decree of divorce from the bond of matrimony, provided that the mother would have custody of the child, that Ward would pay $30.00 per

week child support and that he would have reasonable rights of visitation with the child.

In October of 1974, the mother married Faw in Henry County. In February of 1975, Ward married another member of the Army. In February of 1976, he was transferred from duty in Germany and at the time of the hearing was stationed at Ft. Benning, Georgia. This proceeding was filed in September of 1976.

The evidence showed that although the child was adversely affected by the tension resulting from his natural parents' failing marriage, the boy's health improved after the mother married Faw, who provided a stable home for the mother and child. The evidence also revealed that the child became very affectionate toward his stepfather and that, at the time of the hearing in March of 1977, the boy did not know his natural father; the Court below found that Ward was a "complete stranger" to his son. Ward, as of the time of the hearing, had not seen his son since the visit with him almost three and one-half years earlier in September of 1973. The evidence was in direct conflict as to why Ward had not visited the boy. The mother maintained that the father made no efforts to see him while the father claimed that his attempts to visit were frustrated by the mother's conduct.

The record also shows that during the period when Ward was separated from his son, he made the child support payments regularly, that he repeatedly mailed greeting cards on Christmas, at birthdays and upon other special occasions, and also forwarded gifts to his son. No acknowledgment of any of these items was ever received by Ward from his son or from the mother. When asked why he refused to consent to the adoption, Ward testified: "Because I love my son, that's why. And, he is me; he is part of me." On cross-examination, Ward admitted that, in a telephone call from a social worker investigating the case, he earlier had responded to the same

question by stating that the boy was his only son and that he wanted his name to be "carried on." (219 Va. 1122-23).

The Supreme Court reversed the trial court's approval of adoption. It pointed out that Ward was not unfit and had not lost his rights by any actions or conduct, and that:

> the record is devoid of any evidence to establish that continuation of the present limited relationship between Ward and his son, or indeed that any expansion of such relationship which may occur in the future, will be disruptive of the child's well being. (219 Va. 1125).

As to the trial court's view that exposing the boy to his natural father by allowing visitation would be an "experiment" which could have a "very devastating effect . . ." the Supreme Court said no evidence in the record supports such a conclusion.

*Malpass* involved a boy six years old at the time his step-father sought to adopt. The father did not consent. The evidence reflects a divorce in April 1965 after separation in October 1963. There was conflicting evidence as to visitation and support, and it appears each had to go to Court to secure what each thought he or she should have. Both parents remarried; the father in May 1965 at which time he moved to Ohio. He came to Virginia twice each year and visited his son. The mother remarried in November 1966 and lived in Virginia. The adoption petition was filed in November 1968, with the father receiving notice in April 1969. He moved back to Virginia to contest the adoption, and exercised full visitation rights under the divorce decree. This created friction and problems.

The Supreme Court set aside the adoption approved by the trial court, and announced the rule quoted earlier in this Opinion:

> it must be shown that continuance of the relationship between the two would be detrimental to the child's welfare . . ." (213 Va. 392).

[T]he rights of parents may not be lightly severed, but are to be respected if at all consonant with the best interests of the child . . . (213 Va. 393).

The trial court's view that the boy had "too many fathers," a situation it felt to be "as great a source of potential trouble . . ." as no father at all was not enough. Something more than a showing of friction between the parents and "some reaction" on the part of the child is required.

In the present case, the actions of Cheryl Cousins with respect to support, visitation and interest in maintaining contact with Rob are substantially less than the actions of the father in *Malpass* and in *Ward*. There is, however, little difference between her actions and the actions of the father in *Cunningham*. The most significant factor would be that Cunningham "asked the court below to determine the arrearage in support payments . . ." and had been told by a New Jersey attorney that he did not have to pay support after the boy was taken by his mother from that state. To the extent that Cheryl Cousins has not offered to pay any support, though she has been under no order, and has at all times been in the same state with her son, her case differs from *Cunningham*.

This Court can find no significant difference between this case and the others cited from the standpoint of the parent's actions with respect to the child in the past which support a holding that adoption should be granted. There is, however, an additional element here not found in the other cases, and that is the testimony of Dr. Carter and the history of Rob's development.

Dr. Carter is of opinion that Rob would have no problem with the relationship with his mother if there is no change in that relationship. If Cheryl Cousins has no contact with the boy in the future, which would be a continuation of the past three years, there is no reason to expect any difficulty on the boy's part. However, Dr. Carter's opinion also is that if the mother renews her contact and Rob questions whether she might seek custody, or if she renews contact and makes a point of being a mother and being seen as a mother, that would be disruptive. Cheryl Cousins says she wants to be a

part of Rob's life, help him make decisions and apply for custody.

There is no way anyone can be positive that Rob would be upset if his mother came back into his life as a mother, and what would be the extent of that disruption. However, he is a young boy who has successfully overcome problems which were observed by a teacher in the field of emotionally disturbed children, he is no longer an insecure boy who blames himself for being pushed from family to family, and Dr. Carter's opinion on Cheryl Cousins return to Rob's life as a mother is given great weight by this Court.

This Court finds there is evidence that a broadening of the relationship between Rob and his mother may well be disruptive to him. While that is necessarily an uncertain future event, when the likelihood of that happening is weighed against the desire of a mother who has had no contact with her son since October 1978, this Court is of opinion that the mother's desire must be subordinated to the best interest of the child.

Upon considering all the evidence presented, this Court holds that a continuation of the relationship of Cheryl Cousins with Rob, which she would want to lead to a broader relationship, would be detrimental to his welfare. A continuation of the present no contact relationship, while not causing any disruption, serves no useful purpose and denies Rob the right to be a child of a complete family, a detrimental thing itself.

An Order granting the adoption is being entered as of March 19, 1982.