**Richmond**

CATHERINE ROE

V.

DAVID ROE

Record No. 832044.

January 18, 1985.

Present: All the Justices.

*Richard J. Byrd (Moshos, Byrd, McClure, McWeeny & De Deo, P.C.*, on brief), for appellant.

*James M. Lowe (A.D. Meltz; Lowe & Meltz*, on brief), for appellee.

*Amici Curiae: American Civil Liberties Union of Northern Virginia; Center for Constitutional Rights; Lesbian Rights Project; Women's Legal Defense Fund (Ronald W. Stern; John P. Rupp; James R. Stirn; Nancy Polikoff; Covington & Burling; Women's Legal Defense Fund*, on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

This child-custody dispute presents the question whether a child's best interests are promoted by an award of custody to a parent who carries on an active homosexual relationship in the same residence as the child. We conclude that such an arrange-

ment is not in the child's best interests and that an award of custody to such a parent constitutes an abuse of judicial discretion.

Catherine Roe, the mother, and David Roe, the father, (fictitious surnames), were married in 1971. Their only child, a daughter, was born in 1974. The parents separated in 1975 and entered into a property settlement agreement which granted full custody of the child to the mother. The trial court entered a final decree of divorce on "no-fault" grounds in 1976, confirming and incorporating the agreement.

The child remained with the mother until December 1978, when the father took over her care because the mother had become afflicted with cancer, requiring extensive surgery and medical treatment. In the fall of 1979, he petitioned the court for a change of the child's custody to him. The mother opposed the change, acknowledging that the father had assisted her with the child's care on an informal basis, but stating that she was recovering from her illness, had returned to work, and would be ready to assume full-time care of the child by March 1980. In October 1979, however, the parties presented to the court a consent decree which recited that the mother was still physically unable to care for the child, awarded custody to the father, and reserved reasonable visitation rights to the mother. The child has remained in the father's custody to the present time, frequently visiting with her mother.

In July 1983, the mother filed a petition for a temporary restraining order in which she alleged that it had just come to her attention that the father was living with a man who was his homosexual lover, that the two men occupied the same bed in a bedroom in the house in which the father lived with the child, that the child had reported seeing the two men "hugging and kissing and sleeping in bed together," and that other homosexuals visited the home and engaged in similar behavior in the child's presence. The mother further alleged that the child, then nine years of age, was unhappy in the father's home, "hate[d]" the father's lover, and had expressed a desire to return to her mother. The mother contended that she was sufficiently recovered to care for the child full time and wished to do so. The petition asked for a temporary restraining order which would enjoin the father from exercising his custody rights and leave the child in the mother's care until a hearing could be held on the mother's allegations. The petition concluded with a prayer for a change of permanent custody to the

mother. The court entered an order leaving the child with the mother on "visitation" until August 25, 1983, continuing the case to that date for determination, and directing both parties to submit to psychological evaluations.

After hearing the evidence, the court entered a custody order granting "joint, legal custody" of the child to the father and mother. The order provided that the child was to live with the father during the school year and with the mother during the summer vacation, and provided for extensive visitation by each parent when the child was living with the other. The order conditioned the father's custody upon his "not sharing the same bed or bedroom with any male lover or friend while the child is present in the home." We granted an appeal to the mother.*

The trial court found that there was little animosity between the parents. Aside from the central issue pervading this case, each parent had been a fit, devoted, and competent custodian. The court interviewed the little girl and found that she was a "very lovely, outgoing, bright and intelligent child . . . . a very happy child [who] seemed to be well adjusted and outgoing." The court found that there was no evidence that the father's conduct had an adverse effect on the child, but that she did express a wish to live with her mother.

The father openly admitted that he was living in an active homosexual relationship, sharing a bed and bedroom with a male friend in the same house with the child. The father's lover testified as a witness in order, the father says, that the trial court could ascertain that he was a person of good character whose influence in the home would not be harmful to the child.

The father and his male friend both testified that they did not "flaunt" their homosexuality. The court, however, observed: "this relationship of sharing the same bed or bedroom with the child being in the home would be one of the greatest degrees of flaunting that one could imagine. It flies in the face of *Brown* v. *Brown*

---

*The father moves to dismiss the appeal because the record fails to include the transcript of the hearing on August 25, 1983, in violation of Rules 5:9, 5:36, and 5:37. We deny the motion because the oral opinion of the trial court was properly made a part of the record and printed in the appendix. It contains a detailed recital of the facts found by the court and essential to its decision. These facts are entirely undisputed. They constitute a record sufficient to enable us to adjudicate the issues presented on appeal. *See City of Richmond v. Randall*, 215 Va. 506, 211 S.E.2d 56 (1975); *Smyth v. Midgett*, 199 Va. 727, 101 S.E.2d 575 (1958).

[218 Va. 196, 237 S.E.2d 89 (1977)], and it flies in the face of society's mores anyway." Apparently for this reason, the court conditioned the partial award of custody to the father on the requirement that he and his lover not share the same bed or bedroom.

The court expressed concern as to the behavior of the father and his friends in the child's presence, making particular reference to males hugging and "patting each other on the behind." Noting that football players are sometimes seen to do such things, the court stated: "Whether the Court would find them distasteful or not, it is simply not something that the Court is competent to get involved in . . . all of these things require such judgment as to appropriateness or inappropriateness that the Court is simply not going to try and get involved in it." The court also expressed concern as to "what happens when the child turns twelve or thirteen, for example, when she begins dating or wants to have slumber parties, how does she explain this conduct." Conceding that these things might "pose a problem" in the future, the court decided that they were not immediate concerns and could be dealt with when and if they arose, by a change of custody if necessary.

 We agree with the trial court's observation that the father's conduct "flies in the face of *Brown* v. *Brown*" as well as "society's mores." In *Brown*, we affirmed a chancellor's decision to remove the custody of two young sons, ages seven and four, from their mother, who was otherwise a fit custodian, on the sole ground that she was openly living in an adulterous relationship with a male lover, in the same home as the children, during the pendency of the divorce suit. There, we said:

> In all custody cases the controlling consideration is always the child's welfare and, in determining the best interest of the child, the court must decide by considering all the facts, including what effect a nonmarital relationship by a parent has on the child. The moral climate in which children are to be raised is an important consideration for the court in determining custody, and adultery is a reflection of a mother's moral values. An illicit relationship to which minor children are exposed cannot be condoned. Such a relationship must necessarily be given the most careful consideration in a custody proceeding.

218 Va. at 199, 237 S.E.2d at 91. We also quoted with approval from *Beck* v. *Beck*, 341 So.2d 580 (La. App. 1977): "[W]here the mother has recently lived in open and public adultery with her paramour for a substantial period of time, in total disregard of the moral principles of our society, the mother is generally held morally unfit for custody." *Id.* Our decision, however, was not based upon the mother's adulterous relationship in the abstract, but rather on the fact that it was conducted in the children's presence. It was Mrs. Brown's exposure of the children to an immoral and illicit relationship which rendered her an unfit and improper person to have their custody.

Here, the father relies heavily upon *Doe* v. *Doe*, 222 Va. 736, 284 S.E.2d 799 (1981). His reliance is misplaced. *Doe* was not a custody case but was a disputed adoption. There, a divorced couple had a seven-year-old son who resided in Virginia with his father and stepmother. The father had an award of permanent custody which the mother did not contest. The mother lived in Ohio in an open lesbian relationship with another woman. The child was permitted to visit her periodically, but the propriety of such visitation rights was not before us in the adoption case. When the father and stepmother petitioned for an adoption, the trial court granted the petition over the mother's objection, on the ground that her consent was withheld contrary to the best interests of the child. We reversed, noting the difference between custody determinations, which are *ad hoc* and subject to change upon changing conditions, and adoptions, which are final and irrevocable. Although we declined to hold that every lesbian mother or homosexual father is *per se* an unfit *parent*, we were not presented, in *Doe*, with the question of the impact of a homosexual relationship upon a child in the context of day-to-day custody. We refused to terminate all parental rights of the lesbian mother in *Doe*, but we stopped far short of finding her a fit and proper custodian for her son, or even of approving his visitations in her home, while her existing living arrangements continued.

The present case is controlled by *Brown*. The father's continuous exposure of the child to his immoral and illicit relationship renders him an unfit and improper custodian as a matter of law. Indeed, the mother contends that the influences to which the child is exposed here are far more deleterious than those in *Brown*. She points out that, as an illustration of the relative degree of abhorrence by which our society regards such conduct, adultery is a

class four misdemeanor in Virginia (Code § 18.2-365) which is seldom prosecuted, while the conduct inherent in the father's relationship is punishable as a class six felony (Code § 18.2-361) which is prosecuted with considerable frequency and vigor, as evidenced by the decided cases annotated under those respective sections in the Code. However that may be, we have no hesitancy in saying that the conditions under which this child must live daily are not only unlawful but also impose an intolerable burden upon her by reason of the social condemnation attached to them, which will inevitably afflict her relationships with her peers and with the community at large. *See Jacobson* v. *Jacobson*, 314 N.W.2d 78 (N.D. 1981); *M.J.P.* v. *J.G.P.*, 640 P.2d 966 (Okla. 1982); and *Kallas* v. Kallas, 614 P.2d 641 (Utah 1980). The father's unfitness is manifested by his willingness to impose this burden upon her in exchange for his own gratification.

■ The trial court was, as stated above, seriously concerned as to the impact of the father's conduct upon the child, but took the position that its worst features could be allayed by ordering him out of his lover's bedroom. We are not so persuaded. The child's awareness of the nature of the father's illicit relationship is fixed and cannot be dispelled. The open behavior of the father and his friends in the home can only be expected to continue. The impact of such behavior upon the child, and upon any of her peers who may visit the home, is inevitable. We conclude that the best interests of the child will only be served by protecting her from the burdens imposed by such behavior, insofar as practicable. In the circumstances of this case, this necessitates not only a change of custody to the mother, but also a cessation of any visitations in the father's home, or in the presence of his homosexual lover, while his present living arrangements continue.

We will, accordingly, reverse the order appealed from and enter a decree here, vesting sole custody in the mother. The cause will be remanded to the trial court for the entry of further orders providing for reasonable visitation rights to the father, conditioned as set forth above.

*Reversed and remanded.*