**Salem**

EUGENE FRYE

v.

IRVIN C. SPOTTE, et al.

No. 0700-86

Decided August 4, 1987

COUNSEL

Nancyjean Bradford (Bradford & Associates, P.C., on brief), for appellant.

Louis Dene, for appellees.

OPINION

**COLEMAN, J.** — Irvin C. Spotte filed a petition in the trial court seeking the adoption of his stepchildren, Sarah Marie, age 12, and Anna Ruth, age 10. His wife, Brenda Frye Spotte, the children's natural mother, joined in the petition to indicate her consent. Eu-

gene Frye, the children's natural father, received notice of the proposed adoption and filed an answer objecting to it. Social workers with the Russell County Department of Social Services investigated the proposed adoption and pursuant to Code § 63.1-223 they, along with a licensed psychological examiner, filed written reports which are part of the record. Although Frye asserts that information contained in the reports was held inadmissible at trial, the court's order of adoption and the judge's opinion letter specifically refer to the reports, and we find they are properly part of the record on appeal. Following an *ore tenus* hearing, the trial court found that Frye was withholding his consent contrary to the best interests of the children and that a continuation of the relationship between Frye and the children would be detrimental to their welfare, and approved the adoption.

Frye appeals, contending that the evidence is insufficient to support the trial court's findings that a continuation of the parent-child relationship would be detrimental to the children's welfare or that he withheld his consent contrary to their best interests. Since the trial court saw no reason to treat the children separately and since we perceive no justification or requirement for doing so, we review the sufficiency of the evidence to support the trial court's finding as to both children. We conclude that the clear and convincing evidence from the record supports the trial court's findings. Accordingly, the decision to grant the adoption without the consent of the natural father is affirmed.

■ Adoption is governed by well defined legal principles. The welfare of a child is the guidepost in every custody and adoption proceeding. Nevertheless, "the rights of parents may not be lightly severed but are to be respected if at all consonant with the best interests of the child." *Ward v. Faw*, 219 Va. 1120, 1124, 253 S.E.2d 658, 661 (1979) (quoting *Malpass v. Morgan*, 213 Va. 393, 400, 192 S.E.2d 794, 799 (1972)). The natural bond that exists between a parent and child should be accorded great weight. *Doe v. Doe*, 222 Va. 736, 747, 284 S.E.2d 799, 805 (1981). An adoption over objection by a natural parent should not be granted except upon clear and convincing evidence that the adoption would be in a child's best interest and that it would be detrimental to continue the natural parent-child relationship. *See Robinette v. Keene*, 2 Va. App. 578, 347 S.E.2d 156 (1986).

█ In custody, visitation and support proceedings, a trial court retains jurisdiction to modify or correct orders which future developments prove to have been ill advised. However, when an order of adoption becomes final, the natural parent is forever divested of all legal rights and obligations with respect to the child, *Doe*, 222 Va. at 746-47, 284 S.E.2d at 805, and the adoptive parent obtains all the legal rights and obligations of a natural parent. Adoption over the objection and without the consent of a natural parent must be clearly warranted before the court will take such extreme action. Although courts must use measured care and caution, particularly when after a divorce the adoption severs the remaining parental rights of a noncustodial parent, courts should act deliberately and without hesitation when the circumstances justify doing so, because the future well being of a child lies in the balance. We must, therefore, determine whether the circumstances of this case support the trial court's conclusion that adoption was warranted.

Eugene Frye and Brenda Frye Spotte were married in 1973. Two daughters, Sarah Marie and Anna Ruth, were born to the marriage. In November 1980, while Brenda was hospitalized, Frye loaded the family belongings into a U-Haul trailer and left with his present wife. Brenda checked out of the hospital before her scheduled release and caught Frye in the process of moving out. When Frye left, he arranged to disconnect the water and electricity and removed all food from the home. He left Sarah, then age five, with Brenda, and Anna, age three, with his mother in Hamlin, West Virginia. Brenda traveled to West Virginia the next day to obtain custody of Anna. Due to the family's necessitous circumstances, Brenda was forced to apply for public assistance and food stamps.

In February 1981, in a divorce proceeding the circuit court granted Brenda custody of both daughters, $200 per month child support and $200 per month spousal support. Eugene Frye was granted reasonable visitation rights. The final divorce decree entered in June 1982, incorporated the temporary custody, support and visitation provisions.

Following the 1981 decree, Frye sporadically paid the required support. Brenda testified that she was forced to file a support petition in West Virginia under the Uniform Reciprocal Enforcement of Support Act (URESA). Frye was ordered to pay $2,000 for delinquent child support. He refused to pay the $2,000 arrearage

but resumed monthly payments in April 1983. He again terminated payments in violation of the court order in May 1985. In January 1986, shortly after the petition for adoption was filed, Frye paid the support for June through December 1985, but has made no payments since then.

After Frye deserted his family in 1980, he visited the children only four or five times before the adoption petition was filed in December 1985. Frye, who has apparently been living in West Virginia since shortly after deserting his family, frequently visited the area where his children lived but made no attempt to contact them. Frye accused Brenda of concealing from him the children's whereabouts, but the evidence does not support this contention. Except for a birthday gift of ten dollars to Sarah in January 1981 and a birthday gift of ten dollars to Anna in December 1982, Frye sent no gifts or acknowledgments of any holiday or special occasion. He did not visit the children when they were ill or show any interest in their education, health, social or spiritual development, or their emotional or physical well being. After the adoption petition was filed, Frye requested visitation rights. He bought Anna a gift and attempted to send Sarah a gift, which she refused.

The Department of Social Services reported that Mr. Spotte had established a good father-daughter relationship with the children and would be a suitable parent. The social worker reported personal history information about Frye obtained from Brenda and others. The report stated that Frye was mean and cruel to Brenda and the children; that for the five years before Frye left, Brenda had lived "in pure hell" because of numerous fights and Frye's drunkenness; and that Frye had openly lived with another woman while married to Brenda.

Brenda's twenty year old daughter from a prior marriage, whom Frye had adopted, reported that Frye had been extremely cruel to her during the three and one-half years she lived with him. The daughter asserted that he once fondled her in the genital area and that he came into her bedroom late at night, held her very close and during those times she could feel his erect penis through her nightclothes.

A twenty-three year old son of one of Frye's former wives detailed acts of cruel or excessive corporal punishment and occasions of abuse while he lived with Frye. The former stepson related an

incident involving Frye where he was stripped naked, told to hold his ankles, and beaten with a belt until blood ran down his legs. Frye then placed him in a bathtub of uncomfortably hot water. The former stepson recalled a time when his mother intervened in one of the beatings and Frye beat her with a mining belt. She tried to escape by crawling under the kitchen table, but he pulled her out by the hair, folded her arms behind her back and continued to hit her with the belt. When he and his mother ran from the house, Frye chased them down the street in his underwear.

A licensed psychological examiner who met with Sarah and Anna reported the children's feelings toward their father. Sarah, who spoke freely of her feelings, related memories of her father striking her and her mother; she expressed fear and anger toward him. She stated that she never wanted to see her father again. In assessing Sarah's sincerity and ability to make such judgments, the psychological examiner found her to be earnest and to have given the matter considerable thought. The examiner believed that confidence could be placed in Sarah's judgment.

The psychological examiner stated that Anna was confused and unclear about her feelings toward her father. She spoke about gifts he had promised and said she liked to visit him because she liked "to be where the excitement is." The examiner felt Anna's judgment could not be trusted. She thought that Anna did not understand all the factors involved in making such judgments. The examiner concluded that Anna was "aware of the power she wields as she vacillates back and forth and is likely taking full advantage of this."

The Department's report contained very little information from Frye except that he professed to love his children and was very much against the adoption. Frye's present marriage is his fourth. He has three other children from a previous marriage who have been adopted by their natural mother's husband.

Code § 63.1-225(A) requires the natural parents' consent to an adoption in all but four circumstances. Of the four exceptions, only one possibly applies to the facts of this case: if a natural parent's consent "is withheld contrary to the best interests of the child . . . the court may grant the petition without such consent." Code § 63.1-225(C). To so prove, the evidence must establish that the person withholding consent is acting prejudicially to

the child's interest. *See Malpass,* 213 Va. at 399, 192 S.E.2d at 798. A simple finding that adoption would promote the child's interest or that the adoptive parent could better provide for the child does not alone support the conclusion that consent was withheld contrary to the best interests of the child. *Id.* at 398-99, 192 S.E.2d at 798. Not only must the adoption be in the child's best interest, but a continuation of the relationship between the non-consenting parent and the child must be detrimental to the child's welfare. *Id.* at 399, 192 S.E.2d at 799. If the relationship with the natural parent does not benefit the child, yet it is not shown to be detrimental, there is insufficient justification for granting an adoption over the objection of the natural parent. However, a child need not be in a desperate situation before an adoption may be ordered over the natural parent's objection. Each case must be carefully considered on its own facts and circumstances and· a showing of abandonment, unfitness or other extreme parental misconduct, while significant, does not always have to be shown before the adoption may be granted without parental consent. *See id.*

Courts face an arduous task in dealing with situations where a parent withholds consent for adoption. Finding that the continuation of a poor, strained or nonexistent parent-child relationship will be detrimental to a child's future welfare is difficult. No one can divine with any assurance the future course of human events. Nevertheless, past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold. Trial courts may, when presented with clear and convincing evidence, make an informed and rational judgment and determine that the continued relationship between a child and a non-consenting parent will be detrimental to the child's welfare. *Cf. Banes v. Pulaski Department of Social Services,* 1 Va. App. 463, 466, 339 S.E.2d 902, 904 (1986).

In the present case, the trial court understood the magnitude of the issue and the ramifications of its decision on both the children and parent. The court acknowledged its awareness that the legal relationship between a natural parent and his children should not be severed lightly but specifically found that Frye was withholding his consent to the adoptions contrary to the best interest of the children and that a continuation of the relationship between Frye and the children would be detrimental to their wel-

fare. The trial court's decision, when based upon an *ore tenus* hearing, is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it. *Simmons v. Simmons*, 1 Va. App. 358, 361, 339 S.E.2d 198, 199 (1986). The clear and cogent facts of this case support the trial court's decision. *Martin v. Pittsylvania Department of Social Services*, 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986). We are unable to say that the decision was plainly wrong or without evidence to support it. Code § 8.01-680.

Frye argues that this case is controlled by the Virginia Supreme Court decisions in *Jolliff v. Crabtree*, 224 Va. 654, 299 S.E.2d 358 (1983); *Cunningham v. Gray*, 221 Va. 792, 273 S.E.2d 562 (1981); *Ward v. Faw*, 219 Va. 1120, 253 S.E.2d 658 (1979); and *Malpass v. Morgan*, 213 Va. 393, 192 S.E.2d 794 (1972). We disagree. The cases Frye cites differ from the present case in at least one important and controlling respect: in those cases the evidence did not show that a continuing relationship between the non-consenting parent and the child would be detrimental to the child's welfare. In *Jolliff*, *Ward*, and *Malpass* the evidence against the non-consenting parents consisted of failure to regularly provide support and to visit the children; the parental fitness of the non-consenting parent was not questioned. In *Cunningham* the father had a poor employment record, had occasionally acted violently toward the child's mother, and had been convicted of trespassing and served forty days in jail. In none of these cases was the evidence sufficient to conclude that a continuing relationship between the child and the non-consenting parent would have been detrimental to the child's welfare.

In the present case the evidence goes beyond a simple showing of non-support or lack of parental contact, although those elements are present. When Frye deserted his wife and daughters for another woman in 1980, he took all the food from the family home and disconnected the electricity and water, intentionally leaving the family in necessitous circumstances. Brenda Frye Spotte was forced to apply for public assistance to help feed and support her children. Frye was shown to have a violent temper. He demonstrated recurring incidents of spousal and child abuse, including sexual abuse. Frye's past relationships with his children and stepchildren from previous marriages indicate that a continuing or expanded relationship with Sarah and Anna may well pre-

sent a threat to their emotional, physical and sexual well being. Furthermore the older child, Sarah, has made it known that she does not wish to maintain contact with her father. Frye's recently expressed concern for his children, which began only after he learned of Spotte's desire to adopt the girls, and his irregular support payments are inadequate to vitiate the trial court's finding that Frye has shown a consistent pattern of behavior that is contrary to his children's well being.

In light of circumstances which exist in this case that were not present in *Jolliff, Cunningham, Ward,* or *Malpass,* those cases do not control our decision. The evidence in the present case is sufficient to find that the adoption was in the children's best interest and that a continuing relationship with their natural father would be detrimental to their welfare. Accordingly, we affirm the trial court's decision to permit the adoptions over Frye's objection and without his consent.

*Affirmed.*

Koontz, C.J., and Moon, J., concurred.